IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PACCAR INC. d/b/a PETERBILT          *
MOTORS COMPANY
                    Plaintiff
                                     *

    v.
                                     *     CIVIL NO. SKG-11-2016

ELLIOT WILSON CAPITOL TRUCKS
LLC
                    Defendant        *


*    *    *    *    *    *    *    *    *    *    *    *    *


<u>MEMORANDUM OPINION</u>

Pending before the Court are Peterbilt Motors Company's,
John C. Arscott's, Peterbilt of Baltimore LLC's, and Pete Store—
Delaware's motions to dismiss the counterclaim of Elliot Wilson
Capitol Trucks LLC.  (ECF No. 55, 56 respectively).  Briefing is
complete.  A hearing was held on October 25, 2012.  For the
reasons set forth herein, the motions are DENIED in part and
GRANTED in part.

## I.    Background

Peterbilt Motors Company ("Peterbilt" or
"counterdefendant") is a manufacturer of heavy and medium-duty
trucks and auto parts.  (ECF No. 1, ¶ 3).  Elliot Wilson Capitol
Trucks LLC ("EWCT") and Elliot Equipment Company ("EEC")
(collectively "Wilson" or "counterplaintiffs"), both managed by

1

George Wilson III, are franchisees of Peterbilt and maintain dealerships in Landover and Easten, Maryland respectively. (Id., ¶ 4).  The Wilson dealerships are non-exclusive franchises, selling both Peterbilt and other lines of trucks and auto-parts.

This motion arises out of a dispute over Wilson's attempt to sell the Landover dealership to Norris Automotive Group ("Norris").  In March 2011, Wilson sold their Ford franchise to Norris.  (ECF No. 39, ¶ 38).  As a result of the sale, Norris assumed control over some aspects of the operation of the Landover dealership.  (ECF No. 39, ¶ 37-39).  In July 2011, Peterbilt filed suit against Wilson, alleging that the Norris partnership was entered into without their knowledge or consent, and therefore constituted a material breach of their Dealer Agreement.  (ECF No. 1, ¶¶ 50-53).  Peterbilt also requested declaratory relief regarding their rights and obligations under the Dealer Agreement, and declaratory relief under Maryland's Vehicle Dealer Act. (Id., ¶ 58-69).

In the midst of these events, Wilson and Norris expanded their deal to include Wilson's Peterbilt franchise.  (ECF No. 39, ¶ 50).  Wilson submitted the proposed deal to Peterbilt in August 2011.  (ECF No. 39, ¶ 52).  In response, Peterbilt rejected the proposed transfer and terminated Wilson's franchise.  (ECF No. 39, ¶¶ 56-58).  Wilson and Norris pushed forward, however, and in October 2011 signed a binding letter of

intent, which was submitted to Peterbilt.  (ECF No. 39, ¶ 62).
The proposal was again rejected.  (ECF No. 39, ¶ 63).  In
February 2012, however, Peterbilt exercised its right of first
refusal as to the Norris transfer, and withdrew its August
termination notice.  (ECF No. 39, ¶ 68-69).

Wilson filed a counterclaim in September 2011, and an
amended counterclaim in April 2012.  (ECF No. 13; ECF No. 44).
The counterclaim names Peterbilt, John Arscott ("Arscott"),
Peterbilt of Baltimore LLC ("PB of Baltimore"), and Pete Store
of Delaware as defendants, although in the course of briefing
Wilson dropped all counts against Pete Store of Delaware.  John
Arscott is the owner of PB of Baltimore and a competitor of
Wilson.

The counterclaim alleges that Peterbilt acted in violation
of its statutory and contractual obligations by, inter alia:
(1)failing to make best efforts to approve both the proposed
Norris transaction and an earlier transaction involving both
EWCT and EEC with Hunter Truck Sales and Service ("Hunter"), and
ultimately denying the Norris transaction; (2) coercing Wilson
to accept a transfer to Arscott instead of its preferred
transferees; (3) terminating the franchise without factual
basis, and (4) untimely exercising its right of first refusal
for the Norris deal in conjunction with withdrawal of the
termination notice. (ECF No. 44).  It further alleges that

Arscott and PB of Baltimore interfered with Wilson's contract with Peterbilt and unfairly competed with Wilson.  (ECF No. 44).

Peterbilt, Arscott, PB of Baltimore and Pete Store filed the pending motions to dismiss in June 2012.  (ECF No. 55).

## II.  Analysis

### A. Motion to Dismiss Standard

In evaluating a motion to dismiss, a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).

Plaintiff is not under an obligation to "forecast" evidence sufficient to prove the elements of the claim.  Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012).  Plausibility does not entail a probability requirement, but does require more than the sheer possibility that a defendant has acted unlawfully. Id.  "Legal conclusions, elements of a cause of action, and bare assertions devoid of factual enhancement," in addition to "unwarranted inferences, unreasonable conclusions, or arguments," fail to constitute well-pled facts.  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).  Ultimately, plaintiff must allege sufficient factual allegations "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

## B. Individual Liability

In several counts, counterplaintiffs have named both Arscott, individually, and PB of Baltimore collectively, as defendants.  Arscott is the manager of the PB of Baltimore.  He argues as an initial matter that all claims against him as an individual should be dismissed.  (ECF No. 56-3, 7).

Maryland generally recognizes a presumption against "piercing the corporate veil," and holding corporate officers liable for activities performed in a corporate capacity.  As

noted by Arscott, Section 4A-301 of the Corporations and

Associations Article of the Annotated Code of Maryland provides:

> [e]xcept as otherwise provided by this title, no
> member shall be personally liable for the obligations
> of the limited liability company, whether arising
> under contract, tort or otherwise, solely by reason of
> being a member of the limited liability company.

Under Maryland law, the "general rule is that shareholders are

not held liable for debts or obligations of the corporation

except when it is necessary to prevent fraud or enforce a

paramount equity." Damazo v. Wahby, 259 Md. 627, 633 (Md.

1970). The "common thread running through the Maryland cases .

. . is that the corporate entity will be disregarded only when

necessary to prevent fraud or to enforce a paramount equity."

Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., 275 Md. 295, 312

(Md. 1975).

Arscott argues that as the counterclaim contains no

allegations of fraud, or of a paramount equity at stake, the

claims against Arscott individually should be dismissed. (ECF

No. 56-3, 8).

Counterplaintiffs agree that this is not a case justifying

the piercing of the corporate veil. (ECF No. 67, 25). They do

not argue that veil piercing is necessary to prevent fraud, or

that a paramount equity is at stake. Instead, while not

specifically categorizing it as such, counterplaintiffs allege a

separate theory of corporate officer liability, commonly known
as the "participation theory".  Mark Cohen and Sierra K.
Swearingen, Cause of Action to Establish Liability of Corporate
Director or Officer for Corporation's Wrongful Conduct, 36
Causes of Action 2d 441 (originally published in 2008); Bethea
v. Bristol Lodge Corp., 2002 WL 31859434, 14 (E.D. Pa. 2002).
Under the corporate veil theory, the individual is liable
because the corporation is not a bona fide independent entity:
the acts are therefore truly the individuals.  Id.  In contrast,
under the participation theory, liability attaches "where the
record establishes the individual's participation in the
tortious activity."  Id.

     In general, a corporate director or officer cannot escape
personal liability for torts in which he or she participated
merely by claiming he or she acted as an agent of the
corporation.  See id.; see also, Restatement Second, Agency §
343 (agents are liable for their torts generally regardless of
whether they acted on the principal's behalf).  The Court of
Appeals of Maryland supports this view, and has held that "under
certain circumstances, an officer of a corporation may be held
personally liable for torts of the corporation in which the
officer was personally involved."  Insurance Co. of N. Am. v.
Miller, 362 Md. 361, 385 (Md. 2001).  Under Maryland law,
"corporate officers . . . are personally liable for those torts

which they personally commit . . .  even though performed in the name of an artificial body." Id.; Metromedia Co. v. WCBM Maryland, Inc., 327 Md. 514, 520, 610 A.2d 791, 794 (1992); see also L'Occitane, Inc. v. Tran Source Logistics, Inc., WMN-09-2499, 2009 U.S. Dist. LEXIS 112736 (D. Md. Dec. 3, 2009).

To illustrate, in Fletcher v. Havre de Grace Co., 229 Md. 196, 200-01, 177 A.2d 908, 910 (1962), the Maryland Court of Appeals found that an officer and director of a fireworks company would be personally liable in an action for trespass if they "specifically directed, or actively participated or cooperated in, a particular act" that led to a series of explosions.  In Levi v. Schwartz, 201 Md. 575, 583-84, 95 A.2d 322, 327 (1953), the court held the president of a development corporation personally liable for the corporation's tortious removal of lateral support from an adjacent landowner's lot of ground, when the president had directly supervised the operation.

In their counterclaim, counterplaintiffs allege that Arscott is individually liable for the torts of unfair competition, (ECF No. 39, ¶ 101), tortious interference with contract, (ECF No. 39, ¶ 117), tortious interference with prospective economic relations, (ECF No. 39, ¶ 121), civil conspiracy, (ECF No. 39, ¶ 126), and aiding and abetting tortious conduct (ECF No. 39, ¶ 129).  To the extent that those

claims are plausible, and if they properly allege that Arscott personally oversaw and directed the tortious conduct, these claims against Arscott individually will stand.  If Wilson fails to establish that Arscott "specifically directed, or actively participated or cooperated in" such acts, however, they will be dismissed.  <u>Schwartz</u>, 201 Md. at 583.

### C. Specific Counts

Each claim will be discussed individually <u>infra</u>.

### Count I: EWCT's and EEC's Claim under Section 15-206.1 of the Transportation Article

Wilson alleges that Peterbilt has in several instances violated its obligations under Section 15-206.1(b) of the Maryland Transportation Code.  (ECF No. 39, ¶¶ 75-79, 85-89). Section 15-206.1(b) provides that a

> manufacturer . . . whether directly or indirectly
> through an agent, employee, or representative, may not
> fail to act in good faith; (1) [i]n acting or
> purporting to act under the terms, provisions, or
> conditions of any franchise agreement; or (2) [i]n any
> transaction or conduct governed by this subtitle." Md.
> Code Ann., Transp. § 15-206.1(b)(1-2).

Good faith in this context "means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 15-206.1(a).  Good faith requires that "one party to a contract not frustrate the other party's performance." <u>Lanham Ford, Inc. v. Ford Motor Co.</u>, 273 F. Supp. 2d 691, 694 (D. Md. 2003), aff'd, 101 Fed.Appx 381 (4th Cir. 2004); <u>Jaguar</u>

Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc., 738 F.

Supp. 2d 640, 653 (D. Md. 2010).

Wilson alleges that there are eleven instances of Peterbilt's

violation of this duty by its:

1. Agreeing with Arscott to stop the Wilsons' potential deal
   with Hunter;

2. Failing to reevaluate in good faith the potential EWCT-
   Hunter deal in later years;

3. Punishing EWCT and EEC for being non-exclusive or dual
   dealers;

4. Reacting in a dishonest and commercially-unreasonable
   manner to EWCT's arrangement with Norris;

5. Filing the instant lawsuit and Peterbilt v. Norris to
   damage EWCT's business, isolate the Wilsons, intimidate
   Norris, and disrupt their business relationship

6. Approving Arscott's Seaford location, which is evidently
   an unprecedented encroachment on a Peterbilt dealers AOR

7. Refusing to act in a commercially-reasonable manner with
   regard to staff training, software issues, and pricing
   tapes;

8. Refusing to conditionally approve Norris as a potential
   acquirer, in violation of the Dealer Agreement;

9. Issuing the termination notice without a factual basis,
   thus damaging EWCT in the marketplace and obligating EWCT
   to incur unnecessary legal expenses;

10. Rejecting the binding LOI, in reliance on the
    termination notice's pendency; and

11. Frivolously attempting to exercise a purported ROFR in February 2012, in conjunction with withdrawal of the termination notice.[1]

(ECF No. 39, ¶ 78).  Wilson further contends that Peterbilt's lack of good faith is evidenced in part by the violations of Maryland Transportation Code § 15-211(e)[2] (Id. at ¶ 54), § 15-207(b)[3] (Id. at ¶ 81), §15-207(d)[4] (Id. at ¶ 82), § 15-207(j)[5] (Id. at ¶ 83), and § 15-209(a)[6] (Id. at ¶ 57), alleged in various counts of the complaint.  (ECF No. 67, 16-18).

In its motion to dismiss, Peterbilt notes that courts in the Fourth Circuit have found that the "good faith obligation does not impose new or additional obligations on the franchising party," or "change the terms of the contract." Jaguar Land Rover North America, LLC, v. Manhattan Imported Cars, Inc., 738 F.

---

[1] Peterbilt has not challenged this particular instance in its motion to dismiss.

[2] Prohibiting a manufacturer from "unreasonably withhold[ing] consent to the transfer of a franchise."  Md. Code Ann., Transp. § 15-211(e).  This section is mis-cited as section (d) in plaintiff's complaint.  (ECF No. 39 ¶ 54).

[3] Providing that a manufacturer "may not coerce any dealer to make an agreement with the manufacturer."  Md. Code Ann., Transp. § 15-207(b).

[4] Prohibiting a manufacturer from "coerc[ing] a dealer, by franchise agreement or otherwise . . . to exclude from the use of the dealer's facilities a dealership for which the dealer has a franchise agreement to utilize the facilities or . . . materially change the dealer's facilities or method of conducting business if the change would impose substantial hardship on the dealer."  Md. Code Ann., Transp. § 15-207(d).

[5] Providing that a manufacturer "may not discriminate among its dealers in any program that provides assistance to its dealers, including Internet listings, sales leads, warranty policy adjustments, marketing programs, and dealer recognition programs."  Md. Code Ann., Transp. § 15-207(j).

[6] Provides that a manufacturer "may not terminate, cancel, or fail to renew the franchise of a dealer, notwithstanding any term or provision of the franchise, unless . . . at least 90 days' prior written notice of the termination" are given to the franchise.  Md. Code Ann., Transp. § 15-209(a).

Supp.2d 640, 653 (D. Md. 2010); <u>Waller v. Maryland Nat'l Bank</u>, 620 A.2d 381, 388 (Md. App. 1993); (ECF No. 55-3, 26). Peterbilt also points to two decisions in other circuits analyzing analogous statutes and holding that a franchisor's actions are not in bad faith if motivated by legitimate business interests. <u>See</u> <u>Hickman v. American Honda Motor Co.</u>, 982 F. Supp. 881, 885-86 (N.D. Ga. 1997), <u>Schott Motorcycle Supply, Inc. v. American Honda Motor Co.</u>, 976 F.2d 58, 63 (1st Cir. 1992). Finally, Peterbilt contends that "a manufacturer does not violate Section 15-206.1 merely by seeking to enforce the bargained-for terms of its agreements with its dealers." <u>Jaguar</u>, 738 F. Supp.2d at 653; (ECF No. 55-3, 20).

Based on this foundation, Peterbilt urges the Court to scrutinize each instance of lack of good faith in Count I striking those factual allegations that do not state a violation of the contract or a statute or constitute a tort.  However, a complete breakdown and analysis of these 11 allegations made in Count I is not necessary or helpful at this stage.  Indeed, trial courts are admonished to read a complaint "as a whole, not parsed piece by piece to determine whether each allegation in isolation, is plausible." <u>Braden</u>, 588 F.3d at 594.  In reviewing a motion to dismiss, a court is to look at the gestalt, not the fragments.  A court is to focus on the forest,

not each tree.  Accordingly, the motion to dismiss Count I must be denied on several bases.

First, the alleged violations of Peterbilt's good faith duty that Wilson alleges, evaluated at the "10,000 feet" of an Iqbal/Twombly review, are sufficiently specific and plausible. Second, the majority of the factual allegations in Count I are examined in more detail infra, as they form the basis for later counts.  When examined as individual claims, several sufficiently state a claim cognizable under the law.  For example, the facts of allegation nos. 3 and 7 in Count I form the predicate for Wilson's Count II (violation of Maryland Commercial Code, § 15-207).  Similarly, the facts of allegation nos. 2 and 8 in Count I form the predicate for Wilson's Count V (Breach of Contract).[7]  Third, Peterbilt has acknowledged that some of the allegations of 15-206.1 violations cannot be dismissed on motion at this stage.  Peterbilt stated that "the great majority of the issues identified by Counterclaim Plaintiffs . . . do not give use to any claim under Section 15-

_____

[7] The ninth and tenth allegations are relevant to Count V, although counterdefendants did not challenge those particular claims in briefing so they are not discussed in depth here.  Count IV (violations of the Delaware Code) and Count VII (abuse of process) were based on the fifth and six allegations in Count I.  Both of these Counts have been dropped from the complaint by counterplaintiffs.  At present, therefore, these allegations may provide background to Count I, but as they appear  unconnected to a stated breach of contract or statute or constitute a tort, they do not, by themselves, state a claim for a violation of 15-206.1  The fourth allegation ("reacting in a dishonest and commercially-unreasonable manner to EWCT's arrangement with Norris") also appears similarly unconnected to a tortious act, violation of statute, or breach of contractual obligation, and so cannot alone support a claim for violation of 15-206.1.

206.1 or otherwise." (ECF No. 55-3, 21). Of course, only a minority of the issues need give rise to a claim under Section 15-206.1 to defeat the motion to dismiss as to the count. And, of course, Peterbilt did not move to dismiss allegation no. 11 ("frivolously attempting to excuse a purported ROFR in February 2012, in conjunction with withdrawal of the termination notice"). Peterbilt is testing that alleged improper conduct in a motion for summary judgment. However, this single unchallenged instance of misconduct, if it is a violation of the contract or a statute or constitutes a tort, would prevent dismissal of Count I. Peterbilt does not argue that it is not a violation of the contract, or statute or a tort and since it is sufficiently detailed and plausible under the case law, that alone defeats dismissal of Count I. Having said that, this Count ultimately will not stand if Wilson fails to demonstrate a violation of a contractual provision, or a statute or tortious conduct. Wilson fully recognizes this. At the motions' hearing, counterplaintiffs acknowledged unequivocally that a successful claim under § 15-206.1 is dependent on a finding of a breach of the terms of the contract, a violation of statutory law, or a tortious act.

Accordingly, Count I will rise or fall based on the success of at least one of these subsidiary counts. As the Court has found several of these counts to be sufficient at this early

stage and allegation no. 11 is unchallenged, Count I withstands the motion to dismiss.[8]

## Count II: Violation of Maryland Commercial Code, § 15-207

Count II of Wilson's counterclaim alleges various violations of the Maryland Commercial Code, § 15-207. Specifically, Wilson alleges that (1) Peterbilt attempted to coerce Wilson to sell their franchises to Peterbilt or Arscott in violation of 15-207(b); (2) coerced Wilson to become an exclusive dealer in violation of 15-207(d); and (3) discriminated among dealers in violation of 15-207(j). The Court will analyze each of these claims in turn.

### A. § 15-207(b)

Section 15-207(b) currently provides that:

"[a] manufacturer, distributer, or factory branch, whether directly or through an agent, employee, or representative, may not coerce any dealer to make any agreement with the manufacturer, distributer, or factory branch." Md. Code Ann., Transp. § 15-207(b).

"Coerce" is defined as "to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences, including the loss of any benefit made available to other

---

[8] The Court acknowledges that some of the 11 instances of Peterbilt misconduct do not appear to constitute, in and of themselves, a violation of the contract or statute or constitute a tort.  Evidence of these instances may be admissible as background.  Moreover, it is not clear what Count 1 adds to Wilson's counterclaim, as it is reliant on proof of the conduct alleged under subsequent specific counts under the contract and statutes.  The courts do not recognize any "free floating" "bad faith"; it must be tethered to a violation of a contractual provision or a statute or constitute a tort.

dealers of the same line," 15-207(a)(2)(i) or "to act in any
manner that violates § 15-206.1 [good faith clause] of this
subtitle." § 15-207(a)(2)(ii) (emphasis added).  Coerce "does
not include to argue, urge, recommend, or persuade." § 15-
207(a)(2)(iii).

The statute was amended in 2009 to include the underlined
language, to "add and clarify prohibitions for the protection of
motor vehicle dealerships from discriminatory or coercive
business practices."  2009 Maryland Laws Ch. 747 (S.B. 668); MD
90 Day Rep., 2009 Sess., Part G.  This amendment obviously
expanded the scope of prohibited "coerc[ion]."

Prior to 2009, the meaning of the term "coerce" under
Maryland law was considered comparable to the interpretation of
the term in the Automobile Dealers' Day in Court Act, 15 U.S.C.
§ 1221, et seq. ("ADDCA").  Hale Trucks of Md., LLC v. Volvo
Trucks N. Am., Inc., 224 F. Supp. 2d 1010 (D. Md. 2002);
Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc., 117 Md.
App. 290, 699 A.2d 1209, 1219 (Md. App. 1997); Colonial Dodge,
Inc. v. Chrysler Corp., 11 F. Supp. 2d 737, 744 (D. Md. 1996).
In order for there to be wrongful "coercion" under the ADDCA,
"'the dealer must demonstrate that the manufacturer exercised
coercion or intimidation or made threats against the dealer . .
. to achieve an improper or wrongful objective.'" Hale Trucks,
224 F. Supp. at 1030 (quoting Antwerpen Dodge, 699 A.2d at 1219

n.9).  Every federal court of appeals that has addressed the issue under the ADDCA has held that coercion or intimidation must include a wrongful demand accompanied by the threat of sanctions for noncompliance.  Colonial Dodge v. Chrysler Corp., 11 F. Supp. 2d 737, 743 (D. Md. 1996).  However, these cases are questionable precedent for interpreting the Maryland statute after the expansion of the concept of coercion in the 2009 amendments.

Wilson claims that Peterbilt violated Section 15-207(b) by "attempting to force EWCT and EEC to agree with Peterbilt to sell their franchise back to Peterbilt and Arscott, and not to any other parties such as Hunter or Norris."  (ECF No. 39, ¶ 81).  Wilson alleges that Peterbilt repeatedly suggested Arscott as a potential buyer, (ECF No. 39, ¶ 18), informed Wilson that they would not approve of the sale to anyone other than Arscott or Peterbilt (ECF No. 39, ¶ 24, 33), and stated that they should give up their attempts to find another buyer.  (ECF No. 39, ¶ 41).  The counterclaim further alleges that Peterbilt "unilaterally imposed unrealistic multi-million dollar facility improvement requirements on EWCT" in an attempt to coerce the Wilsons into selling EWCT to Arscott.  (ECF No. 39, ¶ 41(E)).  Finally, the counterclaim alleges that shortly after the filing of the instant lawsuit, Peterbilt's lead counsel contacted EWCT counsel and noted that "the only way out of litigation was for

Wilson to contact Conroy about selling the dealership back to Peterbilt." (ECF No. 39, ¶ 51).

Especially in light of the recently expanded definition of "coercion" under Maryland law, Wilson here has made a plausible claim for relief under § 15-207(b).  Wilson has made detailed allegations regarding Peterbilt's categorical refusal to consider suggested buyers for the Wilson franchises, their stance that the only viable buyers for the franchise were either Peterbilt or Arscott, and their efforts to discourage potential buyers like Hunter.  These demands, as alleged, are wrongful and the accompanying sanctions or threat of sanctions include, <u>inter alia</u>, continued litigation, denial of training, imposition of facility improvements requirements.  Therefore, under <u>Colonial Dodge v. Chrysler Corp.</u>, (and the cases cited therein), Wilson has made a plausible showing of coercion under § 15-207(b) that Peterbilt attempted to coerce Wilson to make a deal to sell the franchise to either Peterbilt or Arscott.

### B. 15-207(d)

Section 15-207(d) provides in relevant part:

> A manufacturer, distributer, or factory branch,
> whether directly or through an agent, employee, or
> representative, may not require or coerce a dealer, by
> franchise agreement or otherwise, or as a condition to
> the renewal or continuation of a franchise agreement,
> to: (1) Exclude from the use of the dealer's
> facilities a dealership for which the dealer has a
> franchise agreement to utilize the facilities; . . .

"Coerce" in this context has the same meaning as in § 15-207(b). Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc., 738 F. Supp. 2d 640, 651 (D. Md. 2010).

Wilson alleges in briefing that "one of—perhaps the single largest—motivating factor for Peterbilt's conduct has been that EWCT and EEC are not exclusive Peterbilt dealers." (ECF No. 67, 29). Count II of the counterclaim asserts, in conclusory fashion, that "[P]eterbilt has violated subsection (d) by, inter alia, requiring EWCT and EEC to become exclusive Peterbilt dealers or face retribution." (ECF No. 39, ¶ 82).

In support of this contention, counterplaintiffs have alleged a widespread practice of favoritism towards exclusive dealers, including systemic preferential treatment that has resulted in a "substantially reduced" number of independent, non-exclusive dealers. (ECF No. 39, ¶ 11-13). More specifically, they describe a letter from Arscott to Peterbilt in which he emphasizes that his dealership is exclusive, and therefore an attractive candidate to acquire the Wilson franchises. (ECF No. 39, ¶ 20). As noted supra, Wilson has adequately alleged that Peterbilt attempted to coerce them to sell their franchise to Arscott and ignored opportunities to sell the franchise to others. It is certainly plausible, based on these facts, that this coercion was motivated by a desire to

force Wilson to transform their franchises—through sale or

otherwise—into exclusive dealerships.  As such,

counterplaintiffs have presented a plausible claim for relief

under 15-207(d).


   **C. 15-207(j)**

   Section 15-207(j) provides that a dealer:

      "may not discriminate among its dealers in any program
      that provides assistance to its dealers, including
      Internet listings, sales leads, warranty policy
      adjustments, marketing programs, and dealer
      recognition programs."  Md. Code Ann., Transp. § 15-
      207(j).


Section 15-207(j) was also enacted in the 2009 amendment to §

15-207.  Neither party cites to any decisions interpreting the

provision, and the Court has found no Federal or Maryland case-

law specific to 15-207(j).  As Peterbilt notes, however, 15-

207(j) is clearly limited to a "<u>program</u> that provides

assistance" to dealers. (emphasis added).  (ECF No. 55-3, 41-

42).  Presumably this limitation was designed to disqualify

allegations of individual or isolated favoritism, in contrast to

more systemic discrimination.  Peterbilt argues that the

complaint does not go beyond isolated accounts of favoritism,

and therefore should be dismissed.  (ECF No. 55-3, 49-50).

   This is perhaps the weakest of Wilson's claims of statutory

violation, and may well be susceptible to dismissal as facts are

developed and as the meaning of "discriminate" is explored.  In this Count, ¶ 83, Wilson only alleges different treatment or opportunities in financing and referrals based on the <u>size</u> of the dealership.  It is not clear that the legislature intended to forbid this type of business conduct and it is further not clear that this financing and referral conduct was part of a dealer assistance "program."  However, in ¶ 47 incorporated by reference, Wilson does appear to allege discrimination in what <u>might</u> be characterized as a dealer assistance program – employee training.  <u>See</u> ¶ 47.  This Count shall stand at this point in the case as meeting the plausibility requirement, but barely.

## Count III: The Federal Automobile Dealers Day in Court Act

The Federal Automobile Dealers Day in Court Act establishes a private cause of action against a manufacturer for its "failure . . .  to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating . . . the franchise with said dealer.  15 U.S.C. § 1221, *et seq*. The statute defines good faith as:

> The duty to act in a fair and equitable manner . . .
> so as to guarantee the one party freedom from
> coercion, intimidation, or threats of coercion or
> intimidation from the other party: Provided, That
> recommendation, endorsement, exposition, persuasion,
> urging or argument shall not be deemed to constitute a
> lack of good faith. <u>Id.</u>

Both sides agree that the analysis under the FADDCA is similar to that under the Maryland's good faith provision.  (ECF No. 55-3, 51); (ECF No. 67, 30).  As such, the Court applies the same analysis to Count III as to Count I.  The Count stands.

**Count IV: Violation of the Delaware Vehicle Franchising Practice Act**

In the course of briefing this motion to dismiss, counterplaintiffs withdrew Count IV of their complaint, but sought leave to amend, stating that Peterbilt did not honor the notice provisions of the Dealer Agreement nor act in a commercially reasonable manner by installing a dealership without having conducted a market study.  (ECF No. 67, 33). Peterbilt opposes Wilson's request to amend.  (ECF No. 76, 2-3). Wilson may file a motion for leave to amend within one week of the date of this memorandum opinion and order.

**Count V: Breach of Contract**

Counterplaintiffs allege that Peterbilt breached its Dealer agreement with EWCT and EEC[9] by (1) "refusing to use best efforts to conditionally approve potential buyers as Addendum E requires;" (2) "refusing to allow EWCT and EEC personnel to attend programs and training;" and (3) "purporting to terminate EWCT's Dealer Agreement for Landover without good cause and then

---

[9] In error, counterplaintiffs neglected to mention EEC in the body of Count V, although they did name EEC in both the heading of the Count and in its conclusion.  The Court considers this count as pled against EEC.

leaving the meritless termination notice open and pending for six months." (ECF No. 39, ¶ 99).  Peterbilt moves to dismiss the first two of these breach of contract claims.  (ECF No. 55-3, 51).

## A. Peterbilt's Refusal to Use Best Efforts

Counterplaintiffs' first breach of contract claim under Count V is based on Addendum E to the franchise agreement, which sets forth the parties' respective rights and obligations with respect to the dealer's sale of its business. It provides, in relevant part:

> DEALER shall give PETERBILT notice in writing before
> undertaking any efforts to sell the dealership.  The
> notice will contain a description of the assets to be
> sold, the proposed selling price, and other terms
> relevant to the sale. Upon request, PETERBILT agrees
> to provide assistance to DEALER in locating BUYER
> candidates acceptable to both PETERBILT and DEALER,
> although DEALER shall independently negotiate any
> buy/sell agreement.  PETERBILT also agrees to make
> best efforts to conditionally approve potential buyers
> to facilitate DEALER's negotiations.  Upon
> conditionally approving a specific buyer, Peterbilt
> will waive its right of first refusal to that buyer.

The two parties have differing views of Peterbilt's obligations under the Addendum.

Peterbilt argues that under the Addendum E they "may conditionally approve a buyer candidate and, in doing so, waive its right of first refusal; or . . . may refuse to conditionally

approve a buyer candidate and subsequently decide whether or not to exercise its right of first refusal."[10]   (ECF No. 55-3, 30).

Essentially, Peterbilt seems to argue that the "best efforts" clause is meaningless.   Under their interpretation they may approve or disapprove of a buyer candidate as they please, with the sole contractual requirement that if they do approve a buyer, they waive their right of first refusal.

Wilson believes that the two final sentences of the Addendum E burden Peterbilt with two distinct obligations. First, Peterbilt must use best efforts to conditionally approve a buyer; second, if they do so approve, they must waive their right of first refusal.   (ECF No. 67, 34).   Wilson goes further, however, suggesting that the best efforts clause includes an obligation that Peterbilt "may not unreasonably withhold its consent" to a proposed transfer.   (ECF No. 67, 35).   They take this phrase from § 15-211(e) of the Maryland Transportation Code, which dictates that a manufacturer's consent to a transfer

---

[10] Peterbilt also argues that the claim fails because neither EWCT or EEC complied with the sequential conditional approval process required by Addendum E, or that any final Hunter transaction was ever negotiated.   (ECF No. 76, 15-16).   It is unreasonable, however, to suggest that Wilson was required to submit a detailed notice in writing to Peterbilt _after_ Peterbilt categorically informed Wilson that they would not approve the offer.   As such, the "best efforts" clause of the Addendum is not dependent on the dealer meeting the requirements earlier in the paragraph, but applies to Peterbilt's behavior throughout the proposal process—indeed, by its terms, the "best efforts" are required to "facilitate negotiations," which occur prior to the formalization of a deal.   The "best efforts" clause would have little meaning if Peterbilt had no duty to use best efforts to approve of—indeed could categorically reject—a potential sale prior to its submission in writing.

may not be "unreasonably withheld."  Md. Code Ann., Transp. §
15-211(e).

A "best efforts" contractual term "necessarily takes its
meaning from the circumstances."  First Union Nat'l Bank v.
Steele Software Sys. Corp., 154 Md. App. 97, 138 (Md. Ct. Spec.
App. 2003).  While contract interpretation is generally a
question of law, "a factual determination may be required as to
what is deemed to be 'best efforts.'"  Id.  The best efforts
standard "has diligence as its essence," and, unlike the good
faith standard that is read into every contract, best efforts
are "imposed only on those contracting parties that have
undertaken such performance."  Id.; see also Farnsworth,
FARNSWORTH ON CONTRACTS § 7.17c (2d ed.2001).  Parties are not
required to define a "best efforts" provision in order for such
a provision to be enforceable.  Id.; Baron Fin. Corp. v.
Natanzon, 509 F. Supp. 2d 501, 509 (D. Md. 2007).

At the least, the best efforts clause in Addendum E
requires that Peterbilt exercise some diligence in considering a
potential buyer for Wilson's franchises.  What exactly this
diligence necessarily entails must be determined from all the
circumstances.  Considering the statutory background during the
formation of the contract, under which a dealer may not
unreasonably withhold consent to a transfer, the diligence
required here must include an obligation to make reasonable

efforts to approve a transfer, or, conversely, to not
unreasonably reject a transfer.  <u>See</u> Randolph Stuart Sergent, <u>Do
Your Best with "Best Efforts:" Using Open Contract Terms</u>,  Md.
B.J., March/April 2007, at 49 ("In terms of content, the
Maryland courts have found that a promise to exercise best or
reasonable efforts, whether express or implied, contains two
separate requirements of "good faith" and "reasonable diligence"
in pursuing the stated goal.").  In essence, the clause dictates
that Peterbilt must view the proposed transfer in the most
favorable light possible to the dealer.  It can be said that
Peterbilt is to "extend itself" to conditionally approve a
potential buyer, to "facilitate" or assist the dealer in its
negotiations.  If the transfer is deemed unacceptable as a
rational business matter even in this light, Peterbilt may
reject the proposal and exercise its right of first refusal.  If
the counterclaim contains sufficient facts to support a
plausible claim that Peterbilt did not exert this required
effort, however, the claim should stand.

     In support of Count V, the counterclaim alleges that
Peterbilt: (1) "engaged for months in backroom maneuvering to
discourage the [Hunter] transaction and to push the Wilsons
toward Arscott," (ECF No. 39, ¶ 18), (2) informed Wilson that
Arscott was the only potential buyer that Peterbilt would
consider, (<u>Id.</u> at ¶ 25), (3) refused to communicate or meet with

Andrew Franklin (CEO of Norris) about a potential deal with Norris, (<u>Id.</u> at ¶ 58), (4) consistently communicated with Arscott regarding attempts to block both deals. (Id. at ¶ 20-24, 40).

The counterclaim unquestionably has laid out a plausible claim for relief.  Wilson has, with significant detail, alleged a scenario in which Peterbilt, single-mindedly interested in a transfer to Arscott, made little or no effort to consider alternative buyers for the Wilson franchises.  Indeed, the counterclaim alleges that Peterbilt told Wilson they would consider no other buyer other than Arscott, suggesting that Peterbilt made <u>no effort</u> to consider the alternative deals put before it.  The facts alleged conclusively rise above speculative, and therefore survive Peterbilt's motion to dismiss.

## B. Peterbilt's refusal to allow EWCT and EEC personnel to attend programs and training

Counterplaintiffs also allege under Count V that Peterbilt breached the Franchise Agreement by refusing to allow EWCT personnel to attend Peterbilt-required training programs and conferences.  (ECF No. 39, ¶ 99).  In support of its claim, counterplaintiffs point to the Franchise Agreement's provision mandating that:

> PETERBILT periodically will offer general and
> specialized truck and parts sales, and other service

> and technical training programs and materials. DEALER
> agrees that its sales, service and/or parts personnel
> will participate in these programs. Completion of
> training programs is required to comply with training
> standards or recommendations set out in Addendum C.

Peterbilt counters that it denied Wilson's request to send staff

to training events because by this time the staff were Norris,

not Wilson, employees, and Peterbilt had no obligation to invite

Norris employees to a Peterbilt training program.  (ECF No. 55-

3, 51).[11]

The Court finds that Wilson has made a plausible showing

that Peterbilt's refusal to allow Wilson employees to attend

training sessions was a breach of the Dealer Agreement.

Peterbilt does not dispute that it had an obligation under the

contract to allow EWCT employees to attend training events.

(ECF No. 55-3, 51).  While there is some dispute as to whether

these employees were still technically EWCT employees—the

countercomplaint does acknowledge that the "payroll function" of

the dealership was controlled by Norris at that point—at this

early stage Wilson must only provide a plausible showing that it

is entitled to relief.  (ECF No. 39 ¶ 39).  Considering the

facts in the light most favorable to counterclaimants, the Court

---

[11] Peterbilt attempts to introduce an exhibit demonstrating that all EWCT personnel were replaced by Norris employees or became Norris employees.  On a motion to dismiss, however, the Court may consider only the complaint and "documents attached or incorporated into the complaint." E. I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 448 (4th Cir. 2011).  Because this document was not  "integral to and explicitly relied on in the complaint," the court declines to consider it for the purposes of this motion.  Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999). It may be properly considered in a motion for summary judgment.

finds it plausible that employees working at EWCT were entitled mandatory training, even if Norris had some degree of control over the dealership. As such, this claim survives Peterbilt's motion to dismiss.

## Count VI: Unfair Competition (Arscott and Peterbilt of Baltimore)

Wilson has alleged several instances of allegedly unfair competitive behavior by Arscott and PB of Baltimore. These allegations include both disparaging remarks to customers made by representatives of the company, informing them that Wilson was likely to lose its franchise in the near term and that Peterbilt was suing Wilson to terminate the franchise (ECF No. 39, ¶ 48), and allegations against Arscott individually for tortiously interfering with Wilson's contract with Peterbilt and disrupting Wilson's deal with both Hunter and Norris (ECF No. 39, ¶¶ 20, 40, 102, 117).  Wilson alleges that as the result of these actions they lost both customers and the opportunity to pursue partnerships.  (ECF No. 39, ¶¶ 48, 102).

The allegations in the complaint form the basis of a plausible claim for relief and will stand as to both Arscott and PB of Baltimore.  The jury will have to decide whether Peterbilt's alleged conduct constitutes an actionable "unfair method" that is "damaging or jeopardizing [Peterbilt's] business," or "substantially interfer[ing] with the ability to

compete . . . or conflicts with accepted principles of public
policy." <u>Baltimore Bedding Corp. v. Moses</u>, 182 Md. 229, 237, 34
A.2d 338, 342 (1943); Restatement (Third) on Unfair Competition
§ 1 (1995).

   Arscott and PB of Baltimore urge a narrow interpretation of
the tort of unfair competition. They argue that the counterclaim
must allege misleading or deceptive behavior in order to state a
claim for unfair competition.  (ECF No. 56-3, 15).[12]  As to
Arscott and PB of Baltimore's efforts to influence Wilson
customers, they argue that the counterclaim alleges only that
Arscott and PB of Baltimore disseminated public information to
mutual customers, without any allegation that their actions were
accompanied by the "taint of fraud or deception" required under
Maryland law.  <u>Baltimore Bedding Corp.</u>, 182 Md. at 237.

   The Court disagrees that misleading or deceptive conduct is
a necessary element of every unfair competition claim.  First,
Maryland courts' description of the tort is not so narrowly

---

[12] They also contend that the tort "is directed to and can only be committed
with respect to dealings with customers of the two businesses in the
marketplace," and therefore does not encompass Arscott's efforts to dissuade
Peterbilt from approving proposed transfers.  (ECF No. 75, 9).  There is some
support for the proposition that acts interfering with prospective economic
relations are not within the scope of unfair competition; these actions are
already covered under the tort of interference with prospective economic
relations.  Restatement (Third) of Unfair Competition § 1 (1995). As
discussed further <u>infra</u>, the necessary elements of the tort of unfair
competition may vary on a case-by-case basis, and may include any action
taken "to exclude [plaintiff] . . . from the marketplace, or to damage them
as competitors." <u>Trimed, Inc. v. Sherwood Medical Co.</u>, 977 F.2d 885, 891 (4th
Cir. 1992). The Court notes, however, that to give this tort distinct
meaning, counterplaintiffs must allege facts that go beyond those already
alleged in their interference with prospective relations and contract claims.
They have done so here.

drawn.  The law prohibits "damaging or jeopardizing another's business by fraud, deceit, trickery or <u>unfair methods of any sort</u>."  <u>Baltimore Bedding Corp. v. Moses</u>, 182 Md. 229, 237, 34 A2d 338 (1943) (emphasis added).  The Court acknowledges that in this same opinion the Maryland Court of Appeals also stated that the tort of unfair competition is founded on the "general principle that all dealings must be done on the basis of common honesty and fairness, without <u>taint</u> of fraud or deception."  <u>Baltimore Bedding</u>, 182 Md. at 237 (emphasis added).  Since there was indisputably misleading or deceptive advertising found in the <u>Baltimore Bedding</u> case (claim that the defendant had 39 years of experience when it had less than one), the Court did not need to reach the question of whether Maryland recognized the tort of unfair competition in the absence of at least "a taint of fraud or deception." <u>Id.</u>  However, the admitted dicta in <u>Baltimore Bedding</u> forbidding "damaging or jeopardizing another's business by . . . unfair methods of any sort" is wholly consistent with the general view of the law in this area. <u>Id.</u>; <u>see also</u> <u>Mascaro v. Snelling & Snelling of Baltimore, Inc.</u>, 250 Md. 215, 232, 243 A.2d 1, 10 (1968)("As the law [of unfair competition] developed, proof of fraudulent deception was no longer essential for relief, and this is the Maryland rule.").

Second, key treatises recognize the necessarily open-ended nature of the tort of unfair competition.  While the Restatement

(Third) on Unfair Competition identifies several specific categories of conduct constituting unfair competition, it includes "a residual category encompassing other business practices determined to be unfair." Restatement (Third) of Unfair Competition § 1 (1995) Accord 9 Bus. & Com. Litig. Fed. Cts. § 105:67 (3d ed.) (Unfair competition is a "broad and flexible doctrine" and "essential allegations can vary with the type of unfair competition the plaintiff is claiming.")  The Restatement does not require that "other unfair business practices" implicate deceptive or misleading behavior, instead finding a tort where the conduct "substantially interferes with the ability to compete on the merits of their products or otherwise conflicts with accepted principles of public policy recognized by statute or common law." Restatement (Third) of Unfair Competition § 1 (1995).

Finally, the Fourth Circuit's decision in Trimed, Inc. v. Sherwood Medical Co., 977 F.2d 885 (4th Cir. 1992) (interpreting Maryland law), strongly suggests that a finding of unfair competition can be based on an array of actions that interfere with vital aspects of business, such as customer relations, product shipments, or pricing, without evidence of fraud or deception.  Trimed, a distributor of medical supplies, sued Sherwood, the manufacturer of the medical supplies for unfair competition, tortious interference with contract and breach of

contract.  The Fourth Circuit upheld the unfair competition jury instruction, allowing for a verdict of unfair competition based on business actions not clearly deceptive in character.  The challenged instruction provided:

> The law of unfair competition is based upon the premise that while it encourages fair trade in every way, it aims to promote, not hamper competition, no one is justified in damaging or jeopardizing another's business by fraud, deceit, trickery, or <u>unfair methods of any sort</u>.  What constitutes unfair competition in a given case must be decided largely on the particular facts and circumstances of this case.
>
> * * * * *
>
> [Y]ou must be guided by the general principle that all dealings must be done on the basis of common honesty and fairness without taint of fraud or deception.  If you find that any action by [defendant] <u>such as interfering with [plaintiff's] contract with its customers, making disparaging remarks about [plaintiff] to [plaintiff's] customers, restricting product shipments, or selected price cutting</u>, if any of those acts were taken to exclude [plaintiff] . . . from the marketplace, or to damage them as competitors, then you may find that such conduct constituted unfair competition.

<u>Trimed, Inc. v. Sherwood Medical Co.</u>, 977 F.2d 885, 891 (4th Cir. 1992).  (emphasis added).

The appellant did not argue the exact point here, that is, that the instruction was in error because the complained-of conduct was neither deceptive or misleading.  However, the appellant did object to the instruction on the related point

that the complained-of conduct was lawful competitive conduct,
and especially in the absence of a "competitive justification"
instruction.

Accordingly, given the expansive definition of the Maryland
tort in Baltimore Bedding and the Fourth Circuit's endorsement
of that expansive definition in Trimed, in line with the general
view of the necessarily flexible contour of the unfair
competition tort in changing business environment, the Court
shall let Count VI stand.[13]  However, there are limits.  And,
those might be tested here, as some of the allegations, such as
the transmission of public documents, hardly seem unfair or
substantially burdensome to competition under any rubric.  The
Restatement describes the tension inherent in the state of the
law.

> It is impossible to state a definitive test for
> determining which methods of competition will be
> deemed unfair in addition to those included in the
> categories of conduct described in the preceding
> Comments.  Courts continue to evaluate competitive
> practices against generalized standards of fairness
> and social utility.  Judicial formulations have
> broadly appealed to principles of honesty and fair
> dealing, rules of fair play and good conscience, and
> the morality of the marketplace.  The case law,
> however, is far more circumscribed than such rhetoric
> might indicate, and courts have generally been
> reluctant to interfere in the competitive process.
> An act or practice is likely to be judged unfair only
> if it substantially interferes with the ability of
> others to compete on the merits of their products or

[13] Further, as the complaint alleges that Arscott was personally involved in
the alleged anti-competitive behavior, (ECF No. 39, ¶ 48), it will stand as
to both PB of Baltimore and Arscott, individually.

otherwise conflicts with accepted principles of
public policy recognized by statute or common law.

**Count VII: Abuse of Process**

In the course of briefing, Counterclaimants withdrew their
claim for abuse of process. (ECF No. 67, 34).

**Counts VIII: Tortious Interference with Contract**

To establish a claim for tortious interference with
contract under Maryland law, a plaintiff must allege the
following five elements: (1) a contract exists between the
plaintiff and a third party, (2) the defendant knows of that
contract, (3) the defendant intentionally interferes with that
contract (and the interference is wrongful and without
justification); (4) the third party breaches that contract; and
(5) the plaintiff suffers damages from the breach. Océ North
Am., Inc. v. MCS Servs., 795 F. Supp. 2d 337, 346 (D. Md. 2011);
see also Macklin v. Robert Logan Assocs., 334 Md. 287, 298 (Md.
1994).

Tortious interference with contract is often viewed in
comparison to a related tort, tortious interference with
prospective economic relations.  Tortious interference with
contract is reserved for situations in which parties are bound
by a contract that is not terminable at will. Macklin v. Robert
Logan Assocs., 334 Md. 287, 298 (Md. 1994).  It is a stricter
standard: in cases involving a terminable contract, "the

circumstances in which a third party may interfere with the performance of that contract are more narrowly restricted." Id.; Restatement (Second) of Torts § 768 (1979)("[A]n existing contract, if not terminable at will, involves established interests that are not subject to interference on the basis of competition alone.").  In contrast, cases implicating terminable contracts are analyzed under tortious interference with economic relations.  These cases present a more lenient standard: where a contract that is terminable at will is at issue, "a broader right to interfere with economic relations exists."  Id.

The threshold question, therefore, is whether the Franchise Agreement is terminable at will.  Arscott suggests that it is, noting that "one can not interfere with a contract which is lawfully terminable by one party or another."  (ECF No. 75, 11).

Arscott mis-states the law.  A close reading of the contract demonstrates that it is not terminable at will by Peterbilt and a close reading of the case law reveals that interference with non-terminable at will contracts is actionable.

Generally, a contract terminable only for cause is not considered an at-will contract.  Greene v. Nat'l Head Start Ass'n, No. 1:09CV546, 2010 U.S. Dist. LEXIS 42738, *9-10 (E.D. Va. Apr. 30, 2010), Henderson v. Capital Constr., No. 3:08cv207, 2010 U.S. Dist. LEXIS 19847 (E.D. Va. Mar. 4, 2010);

Eric P. Voigt, <u>Driving Through the Dense Fog: Analysis of and
Proposed Changes to Ohio Tortious Interference Law</u>, 55 Clev. St.
L. Rev. 339, 363 (2007)("Either party to an at-will contract may
. . . terminate it at any time and for any reason (i.e., without
good or just cause.")).

The agreement here provides that the dealer may terminate
the Agreement at any time with 30 days notice.  (ECF No. 55-4,
13).  Peterbilt may terminate only with cause.  (ECF No. 55-4,
14).  Circumstances allowing immediate termination include
fraudulent or illegal activity on the part of the dealer or the
dealer's bankruptcy. (ECF No. 55-4, 14).  The agreement also
gives the option to terminate with 60 days notice under certain
circumstances, including a dealer refusal to permit an audit, or
a sale or transfer of location.  (<u>Id.</u>).

As the terms of the Franchise Agreement dictate Peterbilt
could only terminate for cause and under specific circumstances,
the Agreement is not terminable at will.  Accordingly, Wilson is
entitled to the heightened common law protection offered by
tortious interference with contract under the Franchise
Agreement.

Turning to the elements of the claim, counterplaintiffs
easily have alleged with plausibility four of the elements of a
tortious interference claim:  a contract between
counterplaintiffs and Peterbilt, Arscott's awareness of the

37

contract, and Peterbilt's breach of the contract by failing to use best efforts in approving proposed transfers and refusing to allow EWCT personnel to attend training.  As such, the only remaining issue is whether Wilson has made a sufficient showing that Arscott intentionally and wrongfully interfered with the contract so as to induce these alleged breaches.

Maryland largely follows The Restatement (Second) of Torts with respect to this cause of action.  MCS Services, 795 F. Supp. 2d at 346.  In general, courts may evaluate several factors in determining whether such an action is wrongful, including the nature and motive of the actor's conduct, and the social interest in protecting the contractual interests at stake.[14]  Restatement (Second) of Torts § 767 (1979).  In Maryland, if an action is taken with the "indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff," it is "a wrongful act, and therefore . . . actionable."  Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co., 306 Md. 754, 764, 511 A.2d 492, 497 (1986); see also, MCS Services, 795 F. Supp. 2d at 346.  One court has found that "acts by a defendant to induce the third party to

---

[14] The full list of factors is as follows: (a) the nature of the actor's conduct,(b) the actor's motive,(c) the interests of the other with which the actor's conduct interferes,(d) the interests sought to be advanced by the actor,(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,(f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties. Restatement (Second) of Torts § 767 (1979).

breach [a contract not terminable by will] are, themselves, improper and wrongful.  Macklin v. Robert Logan Associates, 334 Md. 287, 304, 639 A.2d 112, 120 (1994).  In general, however, what is wrongful conduct is "incapable of precise definition," and must be determined based on the facts and circumstances at hand.  Id.

As discussed above, Peterbilt was obligated to make a reasonable effort to approve the proposed Hunter and Norris deals: it could not reject them out of hand.  As such, any wrongful effort by Arscott to induce Peterbilt to not exercise the diligence necessary under the contract in considering these proposed deals could plausibly form the basis of a tortious interference with contract claim.  Wilson has detailed several instances in which Arscott (1) allegedly encouraged Peterbilt to ignore without consideration the proposed deals with Hunter and Norris and (2) attempted to convince Peterbilt to only consider Arscott as a potential buyer, (ECF No. 39, ¶ 20, 24).  As such, Wilson has made a plausible case in its counterclaim that Arscott sought to induce Peterbilt to breach its contract with Wilson to Arscott's benefit.

Finally, counterplaintiffs have alleged that Arscott had personal involvement in these efforts, making personal contact with Peterbilt on several occasions in order to dissuade them from making the deal.  (ECF No. 39, ¶ 20, 24).  As a result,

the Count shall stand as to both Arscott individually and PB of
Baltimore.


**Count IX: Tortious Interference with Prospective Economic Relations**

Whereas the tort in Count VIII applies to interference with
existing non-terminable contracts, this tort applies to
"maliciously or wrongfully interfering with economic
relationships in the absence of breach of contract." Natural
Design, Inc. v. Rouse Co., 485 A.2d 663, 674 (1984).  Because
the tort applies to non-contractual relationships, "[a] broader
right to interfere with economic relations exists." Natural
Design, Inc. v. Rouse Co., 302 Md. 47, 485 A.2d 663, 674 (1984);
Oce N. Am., Inc. v. MCS Services, Inc., 795 F. Supp. 2d 337, 348
(D. Md. 2011).

While counterplaintiffs title their count "Tortious
Interference with Prospective Economic Relations," the caselaw
uses different labels for the tort, including Malicious
Interference with Business and Tortious Interference with
Prospective Economic Advantage. Natural Design, Inc. v. Rouse
Co., 302 Md. 47, 68, 485 A.2d 663, 674 (1984); Williams v.
Wicomico County Bd. of Educ., 836 F. Supp. 2d 387, 398 (D. Md.
2011).  Although variously named, the tort requires a showing of
(1) an intentional and willful act; (2) calculated to cause

damage to the plaintiff in his lawful business; (3) done with
the unlawful purpose to cause such damage and loss; without
right or justifiable cause on the part of the defendants (which
constitutes malice); and (4) that caused actual damage or loss.
Williams v. Wicomico County Bd. of Educ., 836 F. Supp. 2d 387,
398 (D. Md. 2011), K & K Mgmt., Inc. v. Lee, 316 Md. 137, 557
A.2d 965, 973 (1989), Natural Design, Inc. v. Rouse Co., 302 Md.
47, 71, 485 A.2d 663, 675 (1984).  As the various labels for the
same or similar torts can muddy the waters, the Court's analysis
will be guided only by those cases that have applied the four
factor test above.

The relevant caselaw includes varying interpretations of
the meaning of "malice" in this context.  Natural Design, Inc.
v. Rouse Co., 302 Md. 47, 71, 485 A.2d 663, 675 (1984).  Some
courts have given "malice" its traditional meaning of ill will
or spite.  Id.; Willner v. Silverman, 109 Md. 341, 355, 71 A. 962
(1909).  In other contexts, "malice" means "a wrongful act done
intentionally without just cause or excuse."  Natural Design,
Inc. v. Rouse Co., 302 Md. 47, 71, 485 A.2d 663, 675 (1984).  A
judge in our district court has found that malice in this
context takes the later meaning: a "wrongful act done
intentionally without just cause or excuse."  havePOWER, LLC v.
Gen. Elec. Co., 183 F. Supp. 2d 779, 784 (D. Md. 2002).  In
general, however, what acts are required to fall under this tort

is decided on a case by case basis. Natural Design, 302 Md. at 71.

This Count is brought against both Peterbilt and Arscott. As to Arscott, the same facts relevant to Count VIII are relevant here. For similar reasons, the Court finds that Wilson has stated a claim for tortious interference with Prospective Economic Relations. While this tort is slightly more lenient towards Arscott than that in Count VIII, Wilson has presented an equally plausible case that Arscott's actions encouraging Peterbilt to disregard proposed deals with Hunter and Norris and only deal with Arscott constitute actionable wrongful acts. Further, Wilson plausibly alleges that as a result of these acts, Wilson could not complete transfers in its best interest, and therefore suffered harm. As with Count VIII, Arscott has personal involvement in these alleged tortious actions, and therefore may be held personally liable.

Wilson's allegations against Peterbilt are sufficient for reasons stated supra. Wilson has plausibly alleged that Peterbilt, in violation of both the Franchise Agreement and Maryland Law, blocked potential transfers to Hunter and Norris. As a result, this count survives the instant motion.


**Count X: Civil Conspiracy**

In Maryland, the elements of civil conspiracy are (i) a confederation of two or more persons by agreement or understanding; (ii) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (iii) actual legal damage resulting to the plaintiff.  Lloyd v. General Motors Corp., 397 Md. 108, 154, 916 A.2d 257, 284 (2007).  An unlawful act connotes a tort, breach of contract or other actionable wrong. Paul Mark Sandler, James K. Archibald, Pleading Causes of Action in Maryland, PCA MD-CLE 3-133; Columbia Real Estate Title Ins. Co. v. Caruso, 39 Md. App. 282, 289, 384 A.2d 468, 472 (1978).  Civil conspiracy is "not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff."  Haley v. Corcoran, 659 F. Supp. 2d 714, 726 (D. Md. 2009).

As an initial matter, all counterdefendants argue that as their position is that all underlying torts alleged should be dismissed, Count IX, too, should be dismissed. (ECF No. 56-3, 19).  They do not present any other arguments as to this claim. As discussed supra, counterplaintiffs' tort claims for interference with contract, interference with prospective economic relations, and unfair competition survive this motion. Counterplaintiffs have alleged that Arscott and Peterbilt agreed

that no sale would be made to anyone other than Arscott and PB of Baltimore, and in the course of this agreement unfairly competed, breached Wilson's Franchise Agreement, and interfered with Wilson's prospective economic relations.  (ECF No. 39, ¶ 14, 15, 20, 22).  Accordingly, Count X will stand as to these underlying torts.

Counterdefendants also argue that any allegations of civil conspiracy to violate the statutes at issue here should fail. Counterdefendants note that conspiracy claims presuppose that "the coconspirator is legally capable of committing a tort, that is, that she owes a duty to the plaintiff recognized by law and is potentially subject to liability for breach of that duty." Bahari v. Countrywide Home Loans, 2005 WL 3505604, * 6 (D. Md. Dec. 16, 2005).  Because the statutes cited by counterplaintiffs "indisputably do not create any duty owed by Arscott, PB of Baltimore, or PS-D to Counterclaim Plaintiffs," counterdefendants argue that they "cannot have 'conspired' to violate those statutes."  (ECF No. 55-3, 53).

Counterdefendants are correct. The statutes at issue here prescribe the duties owed by a manufacturer to its dealers. (ECF No. 55-3, 53).  They do not create any duties owed by existing dealers.  Counterplaintiffs have implicitly acknowledged this: all remaining counts against Arscott and PB of Baltimore are tort claims.  Counterplaintiffs do not argue

that Arscott and PB of Baltimore have any obligations under the statutes at issue here.  As such, the civil conspiracy count is dismissed to the extent that it included any statutory violations as predicate acts.

## Count XI: Aiding and Abetting Tortious Conduct

To establish a cause of action for aiding and abetting, a plaintiff must establish that (1) there is a violation of the law by the principal, (2) that the defendant knew about the violation, and (3) that the defendant gave substantial assistance or encouragement to the principal to engage in the tortious conduct.  Christian v. Minnesota Mining & Mfg., 126 F. Supp. 2d 951 (D. Md. 2001).  As with civil conspiracy, the tort is not independently actionable: there must be underlying tortious activity.  Alleco, Inc. v. The Harry & Jeanette Weinberg Foundation, Inc., 340 Md. 176, 665 A.2d 1038 (1995). As with Count X, defendants argue only that the Count should not stand because there is no underlying tortious activity.  (ECF No. 56-3, 20; ECF No. 55-3, 53-54).  As noted supra, the court has not dismissed Counts VIII and IX.  Counterplaintiffs have sufficiently alleged that Arscott has in several instances encouraged Peterbilt to ignore its contractual and statutory obligations. As to Arscott, the claim for aiding and abetting stands as to these counts.

Counterplaintiffs have also brought this claim against Peterbilt for "furthering Arscott's PB of Baltimore's, and PS-D's tortious and wrongful conduct toward EWC and EEC." (ECF No. 39, ¶ 136).   The only claims remaining against Arscott and PB of Baltimore relate to unfair competition and interfering with a contract between Peterbilt and Wilson.   The claim will stand against Peterbilt for allegedly aiding and abetting Arscott and PB of Baltimore in their unfairly competitive actions.   It makes little sense, however, to allege that Peterbilt encouraged Arscott to induce Peterbilt to breach the Franchise Agreement. Peterbilt was clearly the "principal" in this conduct, not Arscott. For Peterbilt, therefore, the Count will only stand as to its alleged aiding and abetting of Arscott and PB of Baltimore in unfairly competing with Wilson.

### III.  Conclusion

For the reasons set forth herein, the motion to dismiss is DENIED in part and GRANTED in part.  A separate Order accompanies this Memorandum Opinion.


Date:  11/21/12_____                    _____/s/_____
                                          Susan K. Gauvey
                                          United States Magistrate Judge