IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PACCAR INC. d/b/a PETERBILT     *
MOTORS COMPANY
                Plaintiff
                                *
    v.
                                *    CIVIL NO. SKG-11-2016
ELLIOT WILSON CAPITOL TRUCKS
LLC
                Defendant        *

    *    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Now pending before this Court is plaintiff's motion for summary judgment as to Counts II and III of the First Amended Complaint and Count XII of defendant's Counterclaim. (ECF No. 77). Defendant has submitted a cross motion for summary judgment as to Count III of the First Amended Complaint. (ECF No. 81). The Court held a hearing on January 10, 2013 and invited, and the parties submitted, additional materials. (ECF Nos. 104 and 105). The Court acknowledges the difficulty of the legal issues here, especially in the absence of controlling Maryland law and appreciates the excellent and helpful briefing and argument on the motions. For the reasons set forth herein, the plaintiff's motion is GRANTED in part and DENIED in part, and defendant's motion is GRANTED.

## I.    Standard of Review

Summary judgment under Fed. R. Civ. P. 56 is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "Material" facts are those that might affect the outcome of the case under the governing law.  Id.  The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).

When considering a motion for summary judgment, the court views all facts and makes all reasonable inferences in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The non-moving party must show that specific, material facts exist to create a genuine, triable issue.  Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  On those issues for which the non-moving party has the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified

2

in the rule.  Fed. R. Civ. P. 56(c); <u>Mitchell v. Data Gen.</u>
<u>Corp.</u>, 12 F.3d 1310, 1315-16 (4th Cir. 1993).  If a party fails
to make a showing sufficient to establish the existence of an
essential element on which that party will bear the burden of
proof at trial, summary judgment is proper. <u>Celotex</u>, 477 U.S. at
322-23.

   The role of the Court at the summary judgment stage is not to
"weigh the evidence and determine the truth of the matter," but
rather to determine whether "there are any genuine factual
issues that can properly be resolved only by a finder of fact
because they may be resolved in favor of either party." <u>Anderson</u>
<u>v. Liberty Lobby</u>, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L.
Ed. 2d 202 (1986).  The issue is "whether the evidence presents
a sufficient disagreement to require submission to a jury or
whether it is so one-sided that one party must prevail as a
matter of law." <u>Anderson</u>, 477 U.S. at 251-52.

   The fact that the parties file cross-motions for summary
judgment does not generally relieve the Court of its obligation
to determine whether there are disputes as to material fact
which prevent entry of judgment as a matter of law.  <u>Bryant v.</u>
<u>Better Bus. Bureau of Greater Maryland, Inc.</u>, 923 F. Supp. 720,
729 (D. Md. 1996)("[C]ross-motions for summary judgment do not
automatically empower the court to dispense with the
determination of whether questions of material fact

exist.")(quoting <u>Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt</u>, 700 F.2d 341, 349 (7th Cir.), <u>cert. denied</u>, 464 U.S. 805, 78 L. Ed. 2d 72, 104 S. Ct. 53 (1983)). When cross-motions for summary judgment demonstrate a basic agreement, however, concerning what legal theories and material facts are dispositive, they may be probative of the lack of a factual dispute.  <u>Shook v. United States</u>, 713 F.2d 662, 665 (11th Cir. 1983).

## II.  Background

Peterbilt Motors Company ("Peterbilt") is a manufacturer of heavy and medium-duty trucks and auto parts.  (ECF No. 1, ¶ 3). Elliot Wilson Capitol Trucks LLC ("EWCT"), managed by George Wilson III ("Wilson"), is a franchisee of Peterbilt and maintains a dealership in Landover, Maryland. (<u>Id</u>., ¶ 4).

This dispute arises from EWCT's attempt to transfer its Peterbilt franchise to Norris Automotive Group ("Norris") in 2011.  Both parties agree that the primary issue is the resolution of cross motions for summary judgment as to Count III of Peterbilt's First Amended Complaint. (ECF No. 77-1, 5; ECF No. 81-1, 4).  Count III asks for declaratory relief as to whether Peterbilt properly executed its right of first refusal ("ROFR") for the Norris transfer on February 1, 2012. (ECF No. 44, ¶¶ 79-85).

A secondary issue is resolution of the propriety of Peterbilt's initial refusal to approve the Norris transfer in August of 2011.  Both Count II of Peterbilt's complaint (Id., ¶¶ 68-78), and Count XII of Wilson's counter-claim (ECF No. 39, ¶¶ 139-142), request declaratory relief as to whether Peterbilt's denial of EWCT's proposed transfer in is in accordance with Maryland law.  Peterbilt, but not EWCT, moves for summary judgment on these counts.

Each party maintains its right to judgment as a matter of law; neither party has identified any disputes as to material fact requiring an evidentiary hearing.[1]  The Court has not identified disputes as to material fact or any issues of credibility that would necessitate an evidentiary hearing.  Accordingly, the Court decides the matters on motion.

### III. Count III: The Right of First Refusal

On February 1, 2012, Peterbilt purported to exercise its contractual right of first refusal for EWCT's proposed transfer of its Peterbilt franchise to Norris.  (ECF No. 77-31, 3). Peterbilt's right of first refusal is found in Addendum E to the parties' Dealer Agreement.  (ECF No. 77-3, 2).  Addendum E provides that Peterbilt must advise EWCT of its intent to exercise its ROFR within 30 days of receiving EWCT's written

---

[1]The parties entered into a procedural agreement submitting these issues to the Court as the finder of fact.  (ECF No. 101-1, 1).

request for approval of a sale to a bona fide buyer.  (Id.).
The sale agreement must be a "bona fide arms length [sic]
agreement," and the Addendum specifies that the "purchase price
and other terms of sale shall be those set forth in such
agreement and any related documents."  (Id.).

    The crux of the issue in Count III is the sufficiency of
EWCT's notice to Peterbilt.  This dispute turns on a series of
exchanges of information in 2011 and early 2012.  It is
undisputed between the parties that Peterbilt initially received
notice of the proposed Norris transaction in an August 2011
letter from EWCT, (ECF No. 77-1, 11; ECF No. 77-24, 2-3).
Peterbilt again received notice, in more detail, by letter in
October 2011.  (ECF No. 77-1, 14; ECF No. 77-26).  It is
similarly undisputed that Peterbilt received some additional
information regarding the deal from EWCT in November and
December 2011.  (ECF No. 81-15, 2; ECF No. 81-7, 3).

    What is in dispute is whether these notifications were
sufficient under both Addendum E and applicable case law to
trigger Peterbilt's option to purchase and start Adddendum E's
30-day clock.  If any of the communications made in 2011, either
alone or in combination, served as sufficient notice of the deal
and triggered the 30-day clock, the purported ROFR exercise on
February 1 2012 was untimely.  If, however, these communications
did not constitute sufficient notice of the transaction, or if

the clock was triggered by further information received in the 30 days prior to Peterbilt's exercise of its ROFR, the exercise was timely and proper.  The parties ask the Court to resolve this question as a matter of law.

**A. Peterbilt's Contractual Right of First Refusal**

As an initial matter, the Court must determine what EWCT's notice obligations are under the Franchise Agreement. Addendum E of the Franchise Agreement describes the process necessary to exercise the right.  (ECF No. 77-3).  The contract language is unambiguous and clear on its face; neither party argues otherwise.

Paragraph four of Addendum E specifies the party's rights and obligations as to the ROFR.  It provides that when the dealer has entered into a "bona fide arms length [sic] written agreement governing such a transfer or sale," Peterbilt will have the right of first refusal.  It specifies that the "purchase price and other terms of sale shall be those set forth in such agreement and any related materials."  Id.  If Peterbilt requires additional information, it may request that EWCT provide "any and all supporting documents relating to the transfer or sale which Peterbilt may require to assess the bona fides of the agreement."  (Id.). A "[r]efusal to provide such documentation or to state that no such documentation exists

shall create the presumption that the buy/sell agreement is not a bona fide agreement." Id.

Accordingly, under Addendum E, EWCT is obligated to provide to Peterbilt a bona fide, arms-length, written buy/sell agreement, which contains the purchase price and "other terms of the sale." EWCT is also obligated to provide, at Peterbilt's request, supporting documentation of the offer.

**B. Governing Law**

A right of first refusal gives the holder a contractual right that the property owner will give him or her the option to purchase, or refuse to do so, before selling to a third party. 19A M.L.E. Sales of Realty § 5. A right of first refusal is distinct from an option: an option can compel a sale by the unwilling owner, whereas a right holder only has the right to receive an offer to buy. 3-11 Corbin on Contracts § 11.3. A right of first refusal "ripens" into an option, however, once the holder of such right is notified by the property owner of the terms of a third-party offer to purchase the property. Id. Once this option is triggered, it must be exercised within the contractual time period specified or, if the contract is silent, in a reasonable time. USEMCO, Inc. v. Marbro Co., Inc., 483 A.2d 88, 95 (1984).

What notice is necessary to trigger the right is the central question before the Court. Neither party has cited a

published Maryland decision articulating the test to determine

when an offer contains sufficient information to trigger the

owner's obligation to respond.[2]  Courts in other states have

concluded, however, that a party "need provide only reasonable

notice of the essential terms of an offer of sale," such that

the holder can decide whether to match the offer.[3]  Dyrdal v.

Golden Nuggets, Inc., 689 N.W.2d 779, 785 (Minn. 2004); see also

John D. Stump & Assoc. v. Cunningham Memorial Park, 419 S.E.2d

699, 706 (W. Va. 1992)("The primary purpose of the notice by the

property owner is to provide the holder of the right of first

refusal with sufficient information to determine whether he is

interested in exercising the right."); Roeland v. Trucano, 214

---

[2] Peterbilt cites, and relies heavily on, the unpublished Maryland case Kia
Motors America, Inc. v. JJF Management Services, Inc., Md. Ct. Spec. App.,
Case No. 900, Sept. Term 2005 (Oct. 10, 2006).  An unreported opinion of the
Maryland Court of Appeals or Court of Special Appeals is neither precedent
within the rule of stare decisis nor persuasive authority.  Md. Rule 1-104.
Nonetheless the Court acknowledges an unpublished opinion, such as Kia, can
be informative and helpful to another court grappling with the same issues.
In any event, Kia is distinct from the present case in that the ROFR clause
specifically provided that the holder was entitled to "all data and
documentation customarily required by it to evaluate a proposed ownership
change."  Id. at 3.  By comparison, the agreement here provided only that the
agreement set forth "purchase price and other terms of sale."  Although it
did not decide the issue, the Kia court found that notice was likely invalid
because the price ("not less than 300,000") was ambiguous.  Id. at 8-9.  As
the contract here contained no provision requiring that the notice be that as
"customarily required," Kia is of limited relevance to the current dispute.
[3] Peterbilt cites to Gyurkey v. Babler, 651 P.2d 928, 931 (Idaho 1982), which
holds that the holder of the right is entitled to have "the entire offer . .
. communicated to him in such a form as to enable him to evaluate it and make
a decision." (emphasis in original).  The rationale in Gyurkey is that
because a holder must exactly match every term of the proposed offer, it must
be made aware of the entire offer to trigger the option.  Id.  While the
general principle in Gyurkey—the holder must receive notice sufficient to
make a decision whether to exercise the right—is in line with case law in
other states, this somewhat stricter standard, which requires more than
simply reasonable notice of the essential terms of an offer, is an outlier
among state courts addressing the issue.

P.3d 343, 348 (Alaska 2009)("[T]he owner must provide adequate
notice of the terms of the offer to the holder of the right.
Adequate notice is notice sufficient to enable the holder . . .
to decide whether to attempt to match the terms.").[4]

Notice may be reasonable even if some of the terms are
ambiguous or uncertain in the eyes of the right holder.  In <u>Koch
Industries, Inc. v. Sun Co.</u>, 918 F.2d 1203, 1212 (5th Cir.
1990), a frequently cited opinion on the issue, the Fifth
Circuit, applying Texas law, found that where an initial offer
is reasonable, but does not, in the opinion of the owner,
contain sufficiently clear information to guide a decision
whether to exercise the right, the owner must affirmatively seek
information that will clarify the offer.  There, plaintiff
argued that the notice received did not reveal the "price in
fact" of the deal or the specific terms of the sale.  <u>Id.</u> at
1213.  As a result, plaintiff maintained that they did not have
sufficient information to make an informed choice to accept or
reject the offer.  <u>Id.</u>

_____

[4] The offer received must also be bona fide. This requirement is generally
recognized by courts, and is often, as here, a contractual prerequisite.
<u>See</u>, <u>e.g.</u>, <u>Uno Rests., Inc. v. Boston Kenmore Realty Corp.</u>, 805 N.E.2d 957
(Mass. 2004), <u>Shepherd v. Davis</u>, 574 S.E.2d 514, 521 (Va. 2003), <u>Story v.
Wood</u>, 166 A.D.2d 124, 126 (N.Y. App. Div. 3d Dep't 1991).  Bona fide in this
context is generally considered to mean an offer made in honesty and good
faith.  <u>See id.</u>  An offer contrived in concert with the seller solely to
extract a better offer from the owner of the right does not meet this
standard.  <u>Story</u>, 166 A.D.2d at 126.  Peterbilt does not argue, much less
present evidence, of dishonesty or bad faith.

The Court disagreed, finding that the Agreement of Sale sent to plaintiff "made a reasonable disclosure of the terms of the . . . deal," and included an unambiguous purchase price. Id.  While some ancillary pricing information was arguably unclear, the court noted that "because Koch did not undertake a reasonable investigation of the terms that it now alleges were unclear, Koch cannot complain that it lacked sufficient information to make an informed choice" about whether to accept the offer.  Id.  The Koch Court required more than a response objecting to the deal on legal grounds: plaintiff's duty "required an actual request for information."  Id. (emphasis in original).

While Koch has not been cited in Maryland, it has been followed by several state courts confronting this issue.[5]  The Supreme Court of Maine has found that for a simple sale of a plot of land, an oral statement of the price is sufficient notice to require the holder of the right to make further inquiries.  Van Dam v. Spickler, 968 A.2d 1040, 1043 (Me. 2009). The Alaska Supreme Court held that a three page Memorandum of Understanding which – was only a "framework for entering binding arrangements in the future," and which included no definite

---

[5] Additionally, the Supreme Court of Massachusetts, while not explicitly following Koch, has similarly held that "circumstances may place the holder on constructive notice that his right of first refusal has been implicated, in which case the holder must investigate and exercise his option within a reasonable period of time."  Town of Sudbury v. Scott, 787 N.E.2d 536, 544 (Mass. 2003).

price - was sufficient to trigger the Koch duty to investigate
despite plaintiffs' objections that it lacked numerous details.
Roeland, 214 P.3d at 349.  The Supreme Court of Minnesota,
citing Koch, has found that a right holder "may have to clarify
or investigate uncertainties and ambiguities of essential terms,
but . . . that such an inquiry must be done within a reasonable
time."  Dyrdal, 689 N.W.2d at 785.  The Supreme Court of Appeals
of West Virginia has also followed Koch, noting that "[i]f there
is some ambiguity in the terms set out in the notice, the proper
recourse for the rightholder is to request additional
information."  Stump, 419 S.E.2d at 706.[6]

Thus, while there is no binding precedent on this issue in
Maryland, after undertaking a review of both Addendum E and the
relevant case law from other states, the Court finds that the
first question is whether Peterbilt received from EWCT a bona-
fide, arms-length buy/sell agreement governing the essential
terms of the Norris transaction, with sufficient detail to allow
Peterbilt to make an informed decision as to whether to exercise
its ROFR.  A secondary inquiry must, as in Koch, examine any
subsequent inquiries or investigations by Peterbilt and EWCT's
response thereto.

---

[6] The Court of Chancery in Delaware also cites to Koch.  Union Oil Co. v. Mobil
Pipeline Co., 2006 Del. Ch. LEXIS 213 (Del. Ch. Dec. 15, 2006).  The court
noted that even if Delaware placed an affirmative duty to investigate on the
right holder, the duty was not triggered because the seller did not satisfy
their initial duty to make a reasonable disclosure of the offer's terms when
they left several essential terms out of the offer.

**C. Communications Regarding the Norris Deal**

**1. The October Letter**

On October 5, 2011, EWCT's counsel sent Peterbilt an email enclosing a binding "Letter Agreement" detailing the terms of a deal between EWCT and Norris for EWCT's Peterbilt franchise. (ECF No. 81-1, 8). The proposal followed an earlier, less detailed proposal sent to and rejected by Peterbilt in August.[7] (ECF No. 77-24). The email noted that "[w]hile you have been very clear that Peterbilt will not . . . allow the Norris Group to be a Peterbilt dealer, [EWCT] and Norris would still like to proceed forward with the transaction and would like to finalize the terms of it." (ECF No. 81-4, 2).

The Letter Agreement is a 5-page, 17-paragraph document. The Agreement - referred to as both a "Letter Agreement" and a "Letter of Intent" in the document - is, by its terms, a "legally binding and enforceable agreement of the parties hereto." (ECF No. 81-4, 6). The Agreement notes in the introduction that the transaction described "will be very similar to the transaction under which Capitol Fleet Service acquired the Ford dealership," a reference to a March 2011 deal in which Norris obtained EWCT's Ford dealership, which operated

---

[7] EWCT initially took the position that the August letter triggered Peterbilt's option (ECF No. 39 ¶ 61); EWCT now contends that the October 5th letter was the triggering event. (ECF No. 81-1, 25).

out of the same Landover premises as the Peterbilt franchise.[8] (Id. at 3).

The Agreement spells out the terms of an acquisition in which the Peterbilt franchise will be controlled by a new, Norris-owned entity, DC Fleet Service. (Id.). Under the deal, Norris Capitol Holdings would acquire a controlling 85% interest in the Peterbilt dealership. (Id.). The relevant terms of the Agreement are as follows:

1. **Price, Assets Transferred**: The Agreement provides for three million dollars in total cash consideration in return for "[t]he Peterbilt sales and service agreement and all of the assets of the Peterbilt dealership." (Id.). Payment is to come in the form of a $25,000 initial payment at closing,

---

[8] In March 2011, EWCT entered into an agreement with Norris to transfer its Ford franchise to a newly created, Norris-controlled entity, Capitol Fleet Service, LLC ("Capitol Fleet"). (ECF No. 77-1, 7). Under the terms of the agreement, EWCT agreed to transfer all . . . tangible personal property located at, or used in connection with, the operation of a truck sales and service facility and dealerships operated by Capitol Trucks located on the Premises, including, without limitation, lifts . . . operating equipment, furniture, fixtures, machinery and shop equipment, leasehold improvements, computer equipment, parts and other inventory of all kind and nature, telephone equipment, signs, and office equipment, and any assignable warranties with respect thereto whether or not fully depreciated or expensed. (ECF No. 77-7, 27). In addition, EWCT agreed to transfer its working capital, deposits and advance payments, Peterbilt parts inventory, and all new and used Ford truck inventory. (Id. at 28). The deal was intended to be limited to EWCT's Ford Franchise. (ECF No. 81-1, 12). The agreement specifically excluded new Peterbilt truck inventory, signs and other items subject to return or repurchase by Peterbilt, sales and business records related to Peterbilt Trucks, correspondence and records with Peterbilt, accounts receivable or other amounts payable from Peterbilt, and Peterbilt special tools. (Id. at 29-30). Although by its terms the agreement included EWCT's Peterbilt parts inventory, both Wilson and Andrew Franklin ("Franklin"), owner of Norris, contend that this clause was included in the agreement due to drafting error, and the agreement was not intended to include this inventory. (ECF No. 81-1, 12).

followed by a 47.5% payment on all distributions from the operation of the dealership until the amount is paid in full.  (Id.). Any amount left unpaid after the first 10 years is subject to a rate of one percent interest thereafter and any amounts not paid after 15 years are subject to interest of 2 percent.  (Id.).

2.  **Lease**: The Agreement notes that the parties will enter into a new triple net fifteen year lease with Capitol Gateways Properties, LLC.  (Id.).  The rental price was $20,000.  (ECF No. 77-9).

3. **Management**: The Agreement affords George Wilson an option to remain as Dealer Principal for three years. Otherwise David Cook or another principal of Capitol Holdings will assume the role.  (ECF No. 81-4, 6).

4. **Operating Agreement**: Capitol Holdings agreed to provide to DC Fleet $500,000 and, "in its discretion, may infuse additional working capital as needed."  (Id. at 5).

5. **Documents**: The Agreement stipulates that the Operating Agreement, the Contribution Agreement, and all ancillary documents, collectively termed the "Final Deal Documents," "shall be on commercially reasonable terms and conditions, be consistent with the terms and conditions of this Letter of Intent, and be patterned on the documents in the Ford Transaction."  (Id. at 6).

15

6. **Effect of Letter**:   The parties agree that "they have a
   binding and enforceable deal, regardless that the Final
   Deal Documents have not been completed, and that the Final
   Deal Documents shall, to the extent there is a dispute, be
   subject to the provisions of Section 9 [documents section]
   above." (<u>Id.</u>).

The Agreement is signed by both Andrew Franklin and George
Wilson.

## 2. <u>Peterbilt's Reply</u>

Peterbilt replied to the October Letter Agreement on
November 3, 2011.  (ECF No. 77-28).  The reply detailed four
reasons why the transaction described was deficient and did not
trigger the 30-day clock under Addendum E of the Dealer
Agreement.  (<u>Id.</u> at 2).

First, Peterbilt argued that the transaction "fails to
adequately set forth several material terms."  (<u>Id.</u>).
Specifically, Peterbilt noted that they were unable to "discern
the scope of the deal and what assets are intended to be
transferred."  (<u>Id.</u>).  Peterbilt maintained that because they
were uncertain what Peterbilt assets were already transferred in
EWCT's March deal with Norris, the deficiency was not cured "by
a general statement that all 'assets' of the Peterbilt
dealership shall be contributed to DC Fleet." (<u>Id.</u> at 3).

Specifically, Peterbilt noted that the earlier deal purported to transfer EWCT's Peterbilt parts inventory to Norris, leaving uncertain whether these parts would be included in the proposed deal. (Id. at 2).  In addition, Peterbilt contends that the letter "fails to clearly state the most material of all terms the proposed 'selling price.'" (Id. at 4).  While acknowledging that the Agreement states that $25,000 will be paid at closing, Peterbilt argues that "[t]he remainder of the consideration is wholly dependent upon the performance of DC Fleet, without any specificity as to any particular amount being paid at any time." (Id.).

Second, Peterbilt noted that the transaction as proposed "would not be in compliance with Peterbilt's standard Dealer Sales and Service Agreement." (Id. at 3).  Peterbilt's standard Dealer Agreement provides that the dealer hold exclusive responsibility for maintaining sufficient facilities, capital, assets, equipment, systems, and personnel at the dealership. The letter states that under the proposed transaction "many material functions, such as the hiring of employees, the implementation and management of accounting systems and financial matters . . . will not be performed by the proposed new dealer, DC Fleet," but instead be implemented through Capitol Fleet or other Norris entities. (Id.).  Peterbilt notes that it "cannot approve a dealership where so many of the

17

material functions . . . are subject to the discretion and whim of other parties that are not bound to Peterbilt in any way." (Id.).

Third, Peterbilt contended that the transaction is deficient because "it appears that DC Fleet will not have sufficient financial resources and capital to be approved as a new Peterbilt dealer." (Id.). Peterbilt noted that the new deal would be capitalized by a "$500,000.00 contribution, EWCT's inventory of new Peterbilt vehicles (likely subject to substantial floor plan liabilities), and unspecified series of other operating assets." (Id.). The letter argued that "such [an] amount is insufficient to capitalize a new Peterbilt dealership." (Id. at 4).

Finally, Peterbilt argued that the "transaction . . . is, in actuality, illusory." (Id.). Peterbilt took the position that "at this time, Peterbilt cannot and need not approve or reject the proposed transaction because the most basic element (i.e. EWCT's rights to transfer its Peterbilt franchise) is very much in dispute." (Id.).[9] Peterbilt also contends that the Agreement does not meet the requirements of Addendum E to the dealer agreement, which provides that a dealer give Peterbilt notice, including a description of the assets to be sold and the

---

[9] Peterbilt later withdrew its termination notice, and does not rely on this argument in briefing. (ECF No. 81-1, 26).

proposed selling price, prior to undertaking any efforts to sell the dealership.  (Id.).

### 3. Communications Subsequent to the November Reply

On November 11, 2011, Wilson responded to Peterbilt's November 3 letter.  (ECF No. 81-7).  His stated intent was to "determine if there is a way I can address to your satisfaction the bulk of the objections you raise."  (Id.).  As to Peterbilt's objections regarding assets to be transferred, Wilson answered that "the binding October LOI is very specific – we would be conveying all of Capitol Trucks' assets to Norris."  (Id. at 3).  He noted that in combination with the earlier Ford transaction, this would place Norris in the same position as EWCT was in prior to the March transaction: "this would effectively amount to all of the assets that Capitol trucks had when it owned the Ford franchise."  (Id.).  Wilson specified that Peterbilt parts were not included in the prior transaction with Norris, and therefore would be a part of the deal proposed, and noted that "your attorneys are aware of this."[10]  (Id.).

On December 23, 2011, Paul Trinkoff for Peterbilt wrote to EWCT's counsel in an "attempt to clarify certain information pertaining to the current dispute."  (ECF No. 81-15).  Mr.

---

[10] At the hearing on the motion, counsel stated that EWCT at some point in late October or early November Mr. Hoff, EWCT counsel, confirmed to Mr. Trinkoff, Peterbilt's counsel, that the parts were not included in the prior transaction.  Peterbilt did not dispute this representation in the hearing.

Trinkoff noted that in a November conversation with Mr. Wender, EWCT's counsel, he was informed that the rent for the Landover dealership would be higher than the $20,000 set out in the lease attached to the October Letter; he indicates that a November 25 letter suggested the rental would be $27,000.  Id.  He asks for confirmation of this rental amount and to be advised "of any other changes in the terms outlined in the October 4, 2011, letter."  Id.  EWCT's counsel replied on December 28, attaching a lease amendment confirming an additional $7,000 in rent for the facility.  (ECF No. 81-16).

On January 6, 2012, Mike Conroy of Peterbilt wrote to John Arscott, who was interested in purchasing the EWCT franchise, attaching a brief summary of the proposed deal.  (ECF No. 81-14).  The summary states that the deal includes "'Peterbilt sales and service agreement and all the assets of the Peterbilt dealership.' No further specification."  (Id. at 2). The summary notes that "[t]he letter is silent on, and therefore does not provide that, Norris [sic] assuming any liabilities or debt." (Id. at 3).

The deposition of Elliot Wilson was held on January 9, 2012.  (ECF No. 77-10).  Wilson was asked what specific assets were to be transferred in the transaction.  (Id. at 6).  He replied that the Peterbilt tools, the Peterbilt accessories, parts bins, fixtures, and new truck inventory would all be

included in the deal.  (Id.).  He stated that while the October
letter was silent on liabilities, he assumed that the debt
associated with the inventory would also be transferred.  (Id.
at 7).  He also noted that a $930,000 line of credit against the
parts issued by Suntrust Bank (now combined with the mortgage of
the property) would be conveyed.  (Id.).  Wilson confirmed that
the lease had been amended from $20,000 to $27,000.  (Id.).

In his deposition on the 11th of January, Andrew Franklin
reiterated that the assets to be transferred included Peterbilt
parts, special tools, and new trucks.  (ECF No. 77-30, 5).   He
confirmed that the initial deal between EWCT and Franklin did
not include Peterbilt parts.  (Id.). He confirmed the rent for
the facility increased to $27,000.  (Id. at 7).  Franklin
acknowledged that the liabilities were not specified in the
October Agreement, but stated that it was his understanding
"that the liabilities associated with the assets would . . .
come over with them."  (Id. at 6).

### D. Analysis

Neither side disputes the admissibility of any of the above
factual assertions.  The above-referenced communications and
depositions are all part of the record.  Neither side contends
that there are any outstanding disputes of material fact
necessary for resolution at trial.  They instead ask that the

Court resolve the issue of the sufficiency of the notice as a matter of law.  (ECF No. 77-1, 5; ECF No. 81-1, 3).

Peterbilt's primary argument is essentially the same as the first point made in its November response: the "October Letter omitted several material terms and, therefore, did not adequately apprise Peterbilt of the terms and conditions of the proposed transaction."  (ECF No. 77-1, 23).[11]  Specifically, Peterbilt reiterates that the Letter Agreement fails to identify the assets to be sold or the "real" purchase price of these assets.  (Id.).[12]  The crux of Peterbilt's argument is that the Letter Agreement's clause that "all of the assets of the Peterbilt dealership," were to be transferred is insufficient because Peterbilt did not have complete or accurate knowledge of

---

[11] Peterbilt's November 3 letter thus critiques the proposed transaction both from the point of view of its obligation to consider a transfer and its right to exercise ROFR.  It is abundantly clear that Peterbilt did not like the structure or terms of the agreement as a financial matter, doubting its viability within the context of an approval of a transfer.  However, those concerns do not excuse its contractual right and obligation to either exercise or not its ROFR within 30 days of notice of an agreement.  W. Texas Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1563 (5th Cir. 1990)("[T]he owner of property subject to a ROFR remains the master of the conditions under which he will relinquish interest, as long as those terms are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights."); Roeland, 214 P.3d at 350 (Alaska 2009)(same).

[12] Peterbilt did not press its November 3 complaint regarding the lack of clarity as to price.  The price term is clear, though clearly not to Peterbilt's liking, as there was only a $25,000 initial payment, with the remainder of the $3,000,000 to be paid over time, as a percentage of distributions.

what assets had already been transferred to Franklin in the
March 2011 deal.[13]  (ECF No. 86, 16).

In addition, Peterbilt argues that subsequent to its receipt
of the October letter, it "learned and/or confirmed" that the
proposed transaction included several additional terms,
including: an increase in monthly rental for the facility from
20,000 to 27,000; the fact that the transaction includes EWCT's
Peterbilt parts inventory; the fact that the transaction
requires the acquirer to assume EWCT's current outstanding
Peterbilt parts payable; the fact that the transaction requires
the acquirer to assume certain EWCT bank debt arising in
connection with its purchases of Peterbilt parts inventory; and
the fact that the acquirer must assume EWCT's liability to
Peterbilt related to its current Peterbilt parts and truck
inventory.  (ECF No. 77-1, 23-24).

Peterbilt contends that it became aware of these terms
primarily through depositions with George Wilson on January 9,
and Andrew Franklin on January 11.  (ECF No. 77-1, 17).  As
such, Peterbilt argues that the October Agreement was incomplete
and insufficient to trigger the 30-day clock under Addendum E.

---

[13] Peterbilt also argues that the October Letter does not reflect a final
buy/sell agreement.  (ECF No. 86, 15).  Again reiterating its November
letter, Peterbilt argues that Letter Agreement is "contingent upon the
drafting, finalization and execution of a number of other documents,"
including a contribution agreement, which Peterbilt speculates will "define
and identify the specific assets to be transferred."  (ECF No. 86, 15).  As
such, Peterbilt argues that the proposal is incomplete and was insufficient
to trigger the clock on its right of first refusal.  (Id. at 15-16.).

Peterbilt still maintains, however, that even despite its receipt of this information and its subsequent exercise of the ROFR in February 2012, it _still_ has not received sufficient information to constitute reasonable notice under Addendum E or relevant case-law.  (ECF No. 86, 19).

In reply, EWCT first takes the position that Peterbilt's ROFR exercise on February 1, 2012, undercuts its assertion that is has never received sufficient information to trigger the 30-day window under Addendum E.  "The purported ROFR exercise is . . . compelling proof," EWCT argues, "that, at least as of February 1, 2012, Peterbilt possessed information sufficient for [it] to make a reasoned choice."  (ECF No. 98, 9).

EWCT further contends that all of the terms Peterbilt claims were missing from the October Agreement "were well known and/or readily available to Peterbilt since at least November."  (ECF No. 81-1, 18).  As such, EWCT disputes Peterbilt's contention that early January depositions revealed new information regarding the exclusion of parts from the March deal and changes to the lease agreement, and argues that at the latest, the ROFR window began in November: "[t]here was no vital information suddenly gleaned in January, or even December, that somehow triggered for the first time the thirty-day clock on the ROFR." (ECF No. 81-1, 28).

The key date in this dispute is January 2, 2012, thirty-one days prior to Peterbilt's February 1 exercise of its ROFR.  If, as of January 2, Peterbilt was in possession of the essential terms of the Norris agreement, its exercise on February 1 was outside the 30-day contractual window and therefore untimely. If Peterbilt was <u>not</u> given sufficient notice by that date, however, its exercise was timely under Addendum E.

As of January 2, 2012, Peterbilt undisputedly had the following information, included in the October Letter, in its possession: (1) the identity of the buyer; (2) terms of payment; and (3) the operating structure of DC Fleet (the new entity), including details regarding staffing, administration, and management structure. (ECF No. 81-14).  The letter also gave notice that "all assets," including the Peterbilt sales and service agreement, would be transferred to DC Fleet under the agreement.  (<u>Id.</u>).  Further, as detailed <u>supra</u>, in two subsequent communications from EWCT and its attorneys in November Peterbilt was made aware that Peterbilt parts were part of the assets included in the deal.  They were also told in both November and December that the lease price would be $27,000, rather than the $20,000 initially stated.

The Court finds, at a minimum, this to be sufficient notice under Addendum E to trigger Peterbilt's duty of inquiry.  The October letter, supplemented by later communications, was not a

cursory or vague document.  Peterbilt received a written, arms-
length, binding agreement which contained a clear statement as
to the price and other terms of the deal.  Indeed, Peterbilt's
exercise of its ROFR in February presents a strong inference
that Peterbilt received sufficient information with which to
make a reasoned choice (in November or December) as to whether
to accept the proposed deal.

Peterbilt has repeatedly argued, both at the hearing on its
motion and in subsequent supplemental briefing, that the October
Letter Agreement was not in accordance with industry custom and
practice.  (ECF No. 105, 3).  Peterbilt notes that the October
Agreement was not a "typical" buy/sell agreement under industry
standards.  (Id.).  Peterbilt suggests it was entitled to a
"fully-negotiated, definitive written buy/sell or asset purchase
agreement, which is not subject to further negotiation and
describes in detail the terms and conditions of the proposed
transaction in its entirety."  (Id.).

The Court agrees that Peterbilt did not receive a model or
detailed buy/sell agreement.  Peterbilt undoubtedly would have
preferred to receive a clearer and more detailed description of
the terms of the deal.  The question here is not, however,
whether the notice was perfect. It is whether the notice was
sufficient.  The Court declines to read additional terms into
Addendum E that mandate that the notice received be perfectly

26

consistent with industry standards as Peterbilt posits them or represent a finalized agreement ready for execution; Peterbilt could have contracted for this right and did not.  In the <u>Kia</u> case relied on by Peterbilt the agreement included a clause mandating "receipt of all data and documentation customarily required by it to evaluate a proposed Ownership Change."  <u>Kia</u>, Md. Ct. Spec. App., Case No. 900, Sept. Term 2005 (Oct. 10, 2006).  Such a clause is conspicuously absent here.  Addendum E simply requires that the agreement contain the "purchase price and other terms of sale."  Indeed, the last two sentences of Addendum E provide that Peterbilt may "request . . . any and all supporting documents relating to the transfer."  The clause explicitly considers the possibility that an initial offer may lack certain ancillary documents, and puts on Peterbilt the onus to request further documentation.[14]

Applicable case law supports this view of Addendum E.  <u>Koch</u> and its progeny do not require complete notice consistent with industry standards; the standard is instead whether the right

---

[14] Peterbilt notes that its November letter put EWCT "on notice" of the perceived deficiencies in the October Letter Agreement.  Peterbilt's November letter did not, however, make any specific requests for information or clarification.  It was an outright rejection of the Letter Agreement, (aptly described by EWCT's counsel as "hostility unmixed with curiosity") and did not anticipate any further discussions regarding the terms of the deal.  The Court agrees with the finding in <u>Koch</u> that the owner of the right is obligated to make an "actual request for information."  <u>Koch</u>, 918 F.2d at 1213; see also <u>Roeland</u>, 214 P.3d at 349 (finding insufficient response where "it is difficult to interpret this letter as anything but a rejection").  Peterbilt's wholesale rejection of the offer did not meet this standard.  This holds especially true in light of Peterbilt's failure to reply to Wilson's November response and offer to clarify.

holder received sufficient notice of the terms so as to allow it to make a considered choice.  If so, the burden shifts to the right holder to make reasonable efforts to clarify the deal. See Roeland, 214 P.3d at 346 (finding that a Memorandum of Understanding, that was a "framework for entering binding agreements in the future," was reasonable notice sufficient to trigger duty to investigate).

The Court is also unpersuaded by Peterbilt's argument that it was unaware or not fully aware of key material terms until depositions on January 6 and 10.  These terms included the rental price, the inclusion of Wilson's Peterbilt parts, and liabilities associated with the parts and new trucks.  (ECF No. 77-1, 20-21).  It is undisputed, however, that Peterbilt was told in a letter from Wilson almost two months prior to the depositions that the Peterbilt parts were included in the October deal.  This letter followed a conversation between counsel in which Peterbilt's representation was told the parts would be included.  Peterbilt was also informed in both November and December that the lease terms would be $27,000, not $20,000. (ECF No. 81-16; ECF No. 81-15).

The only terms Peterbilt was arguably made aware of explicitly for the first time in January 2012 were those relating to liabilities.  These include floor plan liabilities associated with new trucks; Peterbilt parts payable; and a loan

28

on the parts with Sun Trust Bank.  It is undisputed that the

October Letter Agreement did not specifically address these

liabilities.  However, as to the floor plan liabilities for the

new trucks, Peterbilt viewed it as "likely" that the truck

inventory asset would be subject to the corresponding debt.  In

its November reply, Peterbilt noted that the new company would

be capitalized by "EWCT's inventory of new Peterbilt vehicles

(likely subject to substantial floor plan liabilities)." (ECF

No. 77-28, 3).  Moreover, Peterbilt had every reason to inquire

as to the status of the liabilities.  While these terms are

undoubtedly important, the Court finds that the ambiguity as to

liabilities in the October letter is not fatal to EWCT's

position.

First, it would be unconventional for such a deal to

exclude, absent express indication, liabilities associated with

the assets transferred.  See Byron F. Egan, Asset Acquisitions:

Assuming and Avoiding Liabilities 116 PENN ST. L. REV. 913, 954

("In any transaction in which a buyer is acquiring an ongoing

business, the buyer is likely to be assuming certain of the

seller's liabilities, especially obligations incurred by seller

in the ordinary course of seller's business.").  Although the

October Letter is not explicit as to these liabilities, their

inclusion was not a radical departure from a common-sense

understanding of the terms of the October Letter Agreement, nor

more importantly from Peterbilt's understanding on how
liabilities were to be treated in the deal.  (ECF No. 77-28, 3).

The Stoetzer Affidavit submitted by Peterbilt attempts to
present a different point of view, stating generally that "[t]he
mere transfer of assets by themselves does not imply the
transfer or assumption of associated debt." (ECF No. 105, 2, ¶
24).  While it is hard to quarrel with such a general statement,
it is equally hard to give it decisive credence on this issue.
Viewed most favorably to Peterbilt, that is, that there are
different ways that buy-sell agreements in the automobile
franchise industry deal with liabilities associated with
transferred assets, Peterbilt did not attempt to confirm its
belief that floor plan liabilities would follow the truck
inventory or attempt to clarify whether liabilities (including
the debt owed to Peterbilt itself) would follow the parts
inventory.  Of course, Peterbilt knew EWCT's liabilities to it
on the parts inventory.  Moreover, given that SunTrust had made
a loan on some of the parts inventory, it is hard to imagine
that those liabilities would not likewise almost necessarily
follow the asset.  The Court agrees that it was not certain,
based on the October Letter, that liabilities would follow
assets, and the amount of all the liabilities.  While the
assumption of liabilities with the transfer of assets was

30

reasonably foreseeable, the total amount of debt that Norris would assume in the proposed deal was not spelled out.

The case law on this point, however, is clear: it is Peterbilt's responsibility to clarify any confusion regarding these uncertain terms in reasonable time.  See Koch 918 F.2d at 1212.[15]  The October Letter Agreement gave Peterbilt clear and reasonable notice that all EWCT assets, likely subject to liabilities, were to be transferred in the deal.  Any ambiguity in the Letter Agreement as to the exact amount or type of debt included in the deal could have been resolved in a matter of days or weeks by a simple letter of phone call.  Indeed, Wilson offered in early November to address Peterbilt's concerns. Peterbilt failed to respond.  Peterbilt acknowledged at the hearing on these motions that the only affirmative effort to clarify the terms was the scheduling depositions for January

_____

[15] Peterbilt's submitted the Stoltzer affidavit which stated, inter alia, that the October letter did not "include many material terms." (ECF No. 105-2, ¶ 20.  However, the Court has concluded that the October letter, supplemented by other communications, put Peterbilt on notice of the terms and triggered Peterbilt's duty to inquire and investigate.  That is what the case law and Addendum E requires.  It does not require a contract that includes all material terms that allow an enforcement of an agreement between the parties to it.  1-2 Corbin on Contracts § 2.8. ("There is no contract until agreement is reached on all material terms.").  That is not, however, the question here under the case law. See Koch, 918 F.2d at 1212 (Finding the "issue is whether Koch had enough information about the terms of the Champlin deal to make an informed choice about purchasing DeepSea on those terms.").  The consensus of judicial opinion is that there is a liberality in reviewing the sufficiency of the notice.  See Stump, 419 S.E.2d at 706 ("Most courts, without any elaborate discussion, require only that reasonable notice be given.").  Courts have rejected the requirement that the proposed deal contain all material terms with specificity.  Roeland, 214 P.3d at 349 (absence of some terms is not fatal as long as "the absence of these details does not leave the essential terms of the transaction unclear.")

2012.  At his deposition, Mr. Conroy of Peterbilt could not recall any efforts to clarify other than the November 3rd letter, which was an outright rejection of the proposed deal.  (ECF No. 81-6, 4).  <u>Koch</u> and its progeny are targeted at preventing exactly this type of inaction.  Ignoring Wilson's subsequent offer to clarify, waiting until January depositions to solicit further information, and then waiting until February 2012 – 4 months after the Agreement was initially received – to exercise the ROFR, is insufficient.

It is important to note that there is no evidence in the record to suggest the lack of detail regarding liabilities in the October letter was due to bad faith or an intentional effort to conceal information from Peterbilt.  Peterbilt received the entire agreement as it then stood; nothing was concealed or intentionally withheld.  Even <u>Gyrukey</u>, upon which Peterbilt heavily relies, holds only that the right holder "is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror."  <u>Gyurkey</u>, 651 P.2d at 931. That is exactly what Peterbilt received.  This is not a case, as in <u>Gyurkey</u>, where a brief description of a written offer was orally relayed to the right holder.  Nothing was concealed or misrepresented in the October Letter.

The Court acknowledges that this interchange was occurring in "the fog of war [of litigation]."  On July 21, 2011,

Peterbilt commenced the instant litigation against EWCT for breach of contract (ECF No. 1).  On August 25, 2011, Peterbilt had given notice of the termination of EWCT's franchise, which EWCT contested.  (ECF No. 77-25, 3).  However, these disputes did not alter the parties' rights under the agreement.  Under both Addendum E and relevant case law, Peterbilt was required to make an expedient effort to clarify the terms of the deal. It did not.

The Court finds that by January 2, 2012, Peterbilt was either aware of the essential terms of EWCT transaction with Franklin or failed through diligent inquiry to attempt to clarify the essential terms.  By this date a reasonable and sufficient time to clarify any confusion regarding these terms had elapsed, such that Peterbilt cannot now complain that it lacked sufficient information to make an informed choice whether to accept or reject.  No new information was discovered in January that could not have been obtained or confirmed through an earlier effort to clarify the terms.  Accordingly, the Court finds that Peterbilt's purported exercise of its ROFR was untimely and is invalid as a matter of law.

## IV.  Count II and Counterclaim Count XII: Peterbilt's Refusal To Consent to the Transfer

In its motion, Peterbilt also asks the Court to rule on Count II of its complaint, which requests a judgment declaring

33

that Peterbilt's initial refusal to consent to EWCT's transfer
of its Peterbilt franchise to Norris was reasonable under the
circumstances.  (ECF No. 77-1, 4-5; ECF No. 44, ¶¶ 68-78).
Peterbilt further requests summary judgment as to Count XII of
EWCT's counterclaim, which asks that the court "issue a
declaratory ruling that Peterbilt is obligated to approve EWCT's
proposed transfer of its Peterbilt dealership."  (ECF No. 39, ¶
142).

Peterbilt requested that this issue be addressed even if
the Court rules in EWCT's favor on the ROFR issue: "[e]ven if
the exercise of the ROFR is not ultimately sustained,
Peterbilt's refusal to consent to EWCT's request to transfer its
Peterbilt franchise to Norris was nevertheless reasonable under
the circumstances."  (ECF No. 77-1, 2).  For its part, EWCT only
moves for summary judgment as to the ROFR issue, and argues,
without analysis, that a finding that the ROFR exercise was
untimely "compels the denial of Peterbilt's Motion as to Count
II of the FAC and Count XII of the Counterclaim."  (ECF No. 81-
1, 4).  Except for a reference to the negligible due diligence
that Peterbilt did of Norris, EWCT does not otherwise address
the unreasonableness of Peterbilt's denial of approval of the
Norris transfer in August.

The Court disagrees that its ruling on the ROFR issue compels
ruling against Peterbilt on Count II of the First Amended

Complaint or Count XII of EWCT's Counterclaim.  As Peterbilt argues, it is possible that while Peterbilt did not properly exercise its ROFR in February 2012, it was within its rights when it initially chose to reject the proposed transaction in August 2011. The Court agrees that these are separate issues, and must be addressed separately.

**A. Governing Law**

Section 15-211 of Maryland's Transportation Code regulates the sale, assignment, or transfer of an automobile dealership or franchise.  Md. Code Ann., Transp. § 15-211.  Section 15-211, like similar statutes in several other states, strikes a balance between the interest of the franchisor in exerting some control over its franchise network, and the interest of the franchisee in conducting its business freely and without fear of unreasonable manufacturer interference.  <u>Crivelli v. GMC</u>, 215 F.3d 386, 390 (3d Cir. 2000)(noting that these statutes "protect the franchisee who has invested substantial capital in the franchise and is therefore vulnerable to a manufacturer who may take advantage of this firm-specific investment.").  Section 15-211(d)(1) protects the former interest,  providing that a dealer "may not sell, assign, or otherwise transfer a franchise or any right under a franchise without the consent of the manufacturer."  This provision is balanced against 15-211(e),

which provides that a manufacturer "may not unreasonably withhold consent to the transfer of a franchise."

These provisions are central to this dispute.  Count XII of EWCT's counterclaim asks for a declaratory judgment under § 15-211(k)[16] of Maryland's transportation code that Peterbilt is "obligated to approve EWCT's proposed transfer of its Peterbilt dealership."  Peterbilt asserts in Count II of its Amended Complaint that "Elliot Wilson cannot meet its burden of demonstrating, under Section 15-211(e) of the Transportation Article, that Peterbilt's refusal to consent . . . was unreasonable under the circumstances."  (ECF No. 44, ¶ 77).  The essential question in both Count II of Peterbilt's Amended Complaint, and Count XII of EWCT's counterclaim, is whether Peterbilt's actions in denying EWCT's proposed transfer to Norris in August 2011 were unreasonable under §15-211(e).  If so, Peterbilt can be compelled to approve the transfer; if not, its refusal was proper and stands.[17]

The Court has found no published Maryland case interpreting the section.  Several other federal courts, however, have interpreted similar statutes within their jurisdictions.  The

_____

[16] §15-211(k) provides that a "manufacturer . . .  violates this section if, without a statement of specific grounds consistent with this title for the action, the manufacturer . . . takes action to prevent or refuse to approve: . . . the sale transfer or assignment of a dealer franchise."

[17]  § 15-211(k) provides that if an "action leading to the denial or the imposition of a condition was in violation of this section, the Administrator may order the sale, assignment, or transfer to be approved by the manufacturer."

Third Circuit interpreted a similar Pennsylvania statute as
preventing "a manufacturer from arbitrarily refusing consent to
a transfer" and "obstinate and unjustifiable blocking of sales."
Rosado v. Ford Motor Co., 337 F.3d 291, 295 (3d Cir. 2003).  A
California Bankruptcy court found that a similar statute in
California required a transfer to be "supported by substantial
evidence showing that the proposed assignee is materially
deficient with respect to one or more appropriate, performance-
related criteria."  In re Van Ness Auto Plaza, 120 B.R. 545,
549 (Bankr. N.D. Cal. 1990).  The Supreme Court of Massachusetts
found that where a manufacturer had "legitimate and reasonable"
concerns regarding a transferee's unauthorized use of its
trademark, it was not unreasonable to reject a proposed
transfer.  Bishay v. Foreign Motors, Inc., 616 N.E.2d 96, 101
(Mass. 1993).[18]

While there is no binding case law in Maryland on the
issue, the Court finds that 15-211(e) requires that the
rejection of a prospective transfer be grounded on a reasonable,
business-related concern regarding the transferee's ability to

---

[18] Some courts have also looked to landlord tenant law to inform an analysis of
franchise transfer statutes.  Christopher J. Curran, Claims Against A
Franchisor Upon an Unreasonable Withholding of Consent to Franchise Transfer,
23 J. CORP. L. 135, 141 (1997).  The Restatement (Second) of Property
provides: "[a] reason for refusing consent to assignment of a lease, in order
for it to be reasonable, must be objectively sensible and of some
significance and not based on mere caprice or whim or personal prejudice."
RESTATEMENT (SECOND) OF PROPERTY § 15.2 cmt. g (1977).

effectively operate the franchise.  An unfounded, arbitrary, or vindictive refusal is violative of the statute.

**B. Events Preceding Peterbilt's Rejection of the Proposed Transfer**

In March 2011, EWCT entered into an agreement with Norris to transfer its Ford franchise to a newly created, Norris-controlled entity, Capitol Fleet Service, LLC ("Capitol Fleet"). (ECF No. 77-1, 7).  Under the terms of the agreement, EWCT agreed to transfer

> all . . . tangible personal property located at, or
> used in connection with, the operation of a truck
> sales and service facility and dealerships operated by
> Capitol Trucks located on the Premises, including,
> without limitation, lifts . . . operating equipment,
> furniture, fixtures, machinery and shop equipment,
> leasehold improvements, computer equipment, parts and
> other inventory of all kind and nature, telephone
> equipment, signs, and office equipment, and any
> assignable warranties with respect thereto whether or
> not fully depreciated or expensed.  (ECF No. 77-7,
> 27).

The agreement specifically excluded Peterbilt new truck inventory and signage, but included, by its terms, Peterbilt parts.  (Id.).  Capitol Fleet took over the hiring or firing of existing EWCT employees, and reserved the right to review and modify pay plans.  (Id., 16; ECF No. 77-15).

In his January 2012 deposition, Wilson stated that he initially told Mr. Conroy of Peterbilt "what was going on" in regards to the transaction on May 10, 2011, two months after the deal was made.  (ECF No. 77-10, 15).  While Mr. Conroy asked for

all of the written agreements relating to the Ford transaction,
Wilson did not give him the signed contribution agreement or
operating agreement at that time.  (Id. at 16).  He stated at
the deposition that he did not hand the documents over because
the deal had not yet closed.  (Id.).  Peterbilt did not receive
these documents until August 18, 2011 when Wilson's attorney
sent Peterbilt's counsel an email attaching the Contribution
Agreement for the Ford acquisition.  (ECF No. 77-11).  The
operating agreement was sent on August 24, 2011.  (ECF No. 77-
13).

Discussions between Wilson and Franklin regarding the
potential sale of EWCT's Peterbilt franchise continued through
the summer.  A draft letter of intent ("LOI") was circulated
among Franklin, Wilson and their respective counsel on June 23rd.
(ECF No. 77-16).  Negotiations between the parties continued
through July and August 2011.  A July 15 draft LOI documents a
proposed deal similar to that proposed in the October letter at
issue supra.  (ECF No. 77-17).  Negotiations continued through
August as the parties attempted finalize a letter of intent.
(ECF No. 77-19, 2).

By late July, Peterbilt had grown increasingly concerned
about Norris' involvement in the operation of the Peterbilt
dealership.  On July 21, 2011, Peterbilt commenced the instant
action against EWCT for breach of contract. (ECF No. 1).

Simultaneously, Peterbilt filed a separate suit against Norris, Capitol Fleet, and Franklin for trademark infringement, tortious interference with contractual relations, and unfair competition. (ECF No. 44, ¶ 39).  The concerns driving the EWCT lawsuit were detailed in a memorandum of discussion points that Peterbilt maintains was given to Alan Hoff on or about August 18, 2011.

The memorandum expresses alarm regarding "systemic changes to the ownership, management and operating structure" of the Landover Dealership.  (ECF No. 77-23, 2).  Specifically, the memorandum notes concerns regarding the replacement of Peterbilt personnel with Norris employees.  (Id.).  Peterbilt believed these employees had access to confidential Peterbilt data and were performing work on Peterbilt trucks in violation of the Dealer Agreement and state law.  (Id. at 4).  As a result of these beliefs, Peterbilt argued that it "has no reason to trust that the Norris Group will act in the responsible manner expected of all dealers and/or live up to the obligations required under the Peterbilt dealer agreement.  (Id. at 5).

Against this backdrop, on August 23, 2011, EWCT sent a letter to Peterbilt giving "advance notice of a potential transfer" of the Peterbilt franchise to Norris.  (ECF No. 77-24).  The letter outlined the terms of a proposed deal.  (Id.).  The transfer was rejected.  In an August 24 reply, Peterbilt stated that EWCT's letter did not describe a final offer, as

negotiations between EWCT and Norris were ongoing.  Peterbilt
maintained that the Ford agreement in March represented a change
in ownership and/or dealer principal in violation of the dealer
agreement.  (ECF No. 77-25, 3).  Peterbilt stated that it did
not "intend to allow Norris and its employees and managers to
act as an unauthorized Peterbilt dealer." (Id.).  Peterbilt
terminated EWCT's franchise with 15 day's notice.  (Id. at 4).

## C. Analysis

ECWT has not challenged the admissibility of the above
facts, nor provided any controverting evidence.  Neither has it
argued that these are issues that must be decided at trial.
Accordingly, based on the underlying, unrebutted evidence, the
Court finds as a matter of law that Peterbilt's refusal to
consent to ECWT's transfer of its franchise was reasonable under
the circumstances.  See Count II of the First Amended Complaint.
The Court further finds that Peterbilt was not obligated to
approve ECWT's proposed transfer of its Peterbilt dealership.
See Count XII of ECWT's Counterclaim.

EWCT does not directly dispute any of the evidence on the
record regarding their communications with Peterbilt as to the
March deal.  Without specification, EWCT simply declares that
the "record in this case is not consistent" with Peterbilt's
assertions regarding EWCT's ceding of control of aspects the

Peterbilt dealership to Norris. (ECF No. 98, 12).  Wilson does
not controvert the evidence submitted regarding Norris' control
over EWCT employees, or regarding Norris' staff's access to
Peterbilt computer systems.  (ECF No. 77-7, 16; ECF No. 77-15).
Further, while EWCT asserts that there was "no reasonable basis
upon which Norris could have been disapproved" (ECF No. 81-1,
30), EWCT makes no evidentiary attempt to cast any doubt on the
reasonableness or legitimacy of Peterbilt's alarm over the
alleged changes to the management structure and operation of the
EWCT Landover Franchise.

Instead, EWCT argues that Peterbilt unreasonably withheld
consent to the transfer, as evidenced by its lack of any
meaningful "due diligence" of Norris.  EWCT charges that
Peterbilt did "no diligence on Norris," other than a perfunctory
Google search before rejecting the deal outright. (ECF No. 81-1,
29).  Michael Conroy of Peterbilt did testify on deposition that
he had met Norris but in terms of further investigation, he had
simply googled him.  (ECF No. 81-11, 4).[19]  The "speed and
brevity" of Peterbilt's rejection of the deal, EWCT contends
demonstrates commitment to a transfer to John Arscott,

---

[19] This argument was raised in briefing in relation to the ROFR issue.  EWCT
chose not to brief the § 15-211 issue, apparently in reliance on its argument
that a resolution of Count II of Peterbilt's complaint was dispositive as to
the transfer issue.  However, Peterbilt clearly asked the court in its
initial motion for summary judgment to resolve the transfer issue even if the
ROFR issue was decided in EWCT's favor.  (ECF No. 77-1, 2).  EWCT was on
notice that this issue was to be resolved.

Peterbilt's preferred transferee.  (Id.).  As a result, EWCT
maintains that Peterbilt unreasonably withheld consent in
violation of § 15-211(e).  (Id.).

In response, Peterbilt does not controvert the minimal
diligence EWCT posits, but contends that little diligence was
required on Norris, as they were already in possession of
sufficient information to reasonably reject the transfer at the
time of receipt.  (ECF No. 86, 31).  Peterbilt argues that at
the time it initially rejected the transfer in August 2011, it
knew the following: that Norris had negotiated a deal that
purported to acquire Peterbilt parts; that Norris had
misappropriated Peterbilt's trademarks; and that EWCT's deal
with Norris breached the dealer agreement through transferring
operational assets and control to Norris.  (Id.).  At the time,
Peterbilt had already filed suit against both EWCT and Norris on
the basis of these beliefs.  As a result, Peterbilt maintains
that its rejection of Wilson was reasonable under § 15-211(e).

The Court agrees.  Without passing judgment on the merits
of the charges of trademark infringement or breach of the dealer
agreement in connection with the March deal with Norris, the
Court finds that the nature of this litigation, and the distrust
that it represents, is a reasonable, sufficient bases for denial
of transfer of the franchise to Norris.  Absent evidence that
this dispute and resultant litigation was manufactured and/or

frivolous, it would be manifestly unreasonable to require a manufacturer to enter into a franchise agreement with a party with which it has ongoing business disputes, including matters of business integrity.  Peterbilt was well within its right to deny a transfer to an entity with which it was already engaged in a lawsuit for trademark infringement, tortious interference with contractual relations, and unfair competition.  This background provides a reasonable explanation for the minimal additional diligence on Norris and speed with which Peterbilt rejected the transfer: all were well aware of their ongoing dispute and Peterbilt was understandably unwilling to enter into a business relationship with Norris at that time.

Even accepting for the sake of argument that Peterbilt preferred John Arscott as a transferee of the EWCT franchise to Norris, the decision was not arbitrary or vindictive.  The record demonstrates that Peterbilt's preference was based on concerns regarding the potential for a successful business relationship with Norris after several months of confusion regarding the March deal between EWCT and Norris, culminating in Peterbilt litigation against both parties.

In sum, the Court finds that there is no dispute as to material fact and Peterbilt is entitled to judgment as a matter of law.  Anderson, 477 U.S. at 251-52.  Accordingly, the Court

finds that the rejection of Norris was not unreasonable under §
15-211(e).

### D. Conclusion

In conclusion, for the reasons set forth above the Court
GRANTS in part plaintiff's motion for summary judgment as to
Count II of the First Amended Complaint and Count XII of the
Amended Counterclaim and the Court DENIES the motion as to Count
III of the First Amended Complaint(ECF No. 77), and the Court
GRANTS defendant's motion for summary judgment as to Count III
of the First Amended Complaint. (ECF No. 81).


Date: 2/7/2013_                        _____/s/_____
                                       Susan K. Gauvey
                                       United States Magistrate Judge